## STEWART et al. vs. M'INTOSH.

APPEAL from *Baltimore* County Court. This was an action of *assumpsit*. The declaration contained six counts. The first and second for goods, &c. sold and delivered, and a *quantum meruit*, &c. The third, fourth and fifth, the common money counts, and the sixth on an *insimul computassent*. The general issue was pleaded.

1. The plaintiffs, (the appellants,) at the trial, read in evidence the following account in the defendant's hand writing, rendered to them as owners of the schooner *Holstein*, by the defendant, *(*the appellee,) and a certain *Patrick Wood*, trading under the firm of *Duncan M'Intosh* and *Wood*, viz.

"Dr. The Owners of Schooner *Holstein*, their account current with *Duncan M'Intosh* and *Wood*

To amount of disbursements of schooner *Holstein*, as per account rendered by Mr. *John Imlay*, dated 25th of August 1800,          $1,443

D and W had an account rendered to them as the owners of a vessel, by M and N. The vessel and her cargo, mentioned in the account belonged to D and W, who were partners in that transaction only. D was the agent in purchasing the vessel and cargo, and in the transactions relating to the original voyage, and as such consigned the vessel and cargo to M and W at *St. Thomas's*, from whence she was to have been sent to W at *Jacquemel*, to be under his direc-

tions. The vessel was prevented from arriving at *Jacquemel*, and got into *Aux Cayes*, when E, acting for W, loaded her with a cargo of coffee and sent he r to *St Thomas's* consigned to N, which cargo is that mentioned in the account; and it was known to M and N that both vessel and cargo belonged jointly and equally to D and W. Evidence was offered by M in an action brought against him by D and W, that before the account was rendered, D was indebted to M and N in $5000, as stated in the account, and in consideration thereof did verbally direct M and N to retain in their hands, out of the proceeds of the vessel and cargo, in discharge of the said debt, the sum of $5000 as charged in the account as retained by them; and to show that when the direction was given to M and N by D, W was indebted to D in a sum larger than the interest of W in the $5000. M offered in evidence certain accounts between D and W signed by D—*Baltimore* county court refused to permit the evidence or accounts offered by M to go to the jury.

M gave in evidence by E, that he E, by authority from W, on behalf of himself and D, purchased at *Aux Cayes* the cargo of coffee mentioned in the first above mentioned account, and shipped it for their account and risk, the cost and charges of which shipment and cargo, he charged to them in an account which he transmitted to W in 1800 soon after the shipment was made; and the first mentioned account was rendered to E by M in 1802, a copy of which he sent to W soon afterwards. That W, both before and after the rendition of the account to E, always alleged against the account which E rendered against D and W, that the voyage from *Aux Cayes* to *St. Thomas's* was and ought to be considered as on account of E; but E insisted on his right to recover from D and W, and brought suit against them, and recovered judgment. That M had not been in this state since 1800, until just before the time he was sued in this action. Before the account was rendered by M, W inquired of E if he had ever brought M to a settlement as to the business of the vessel—*Baltimore* county court refused to direct the jury that from this evidence they might find that W assented to the application made by M of the $5,00 to the payment of the debt due to M from D.

M then gave in evidence, that after the account of E against D and W, charging them with the costs of the cargo shipped to *St. Thomas's* was rendered by him to W, W did, on the part of the owners, object to the said charge, and refused to consider or accept the cargo as the property of D and W, and insisted that it was the property of E, and refused to pay E for it, and continued so to refuse until after a recovery against D and W by E. That D authorised and permitted M to apply the £5000 to the payment of the debt due from D to M but this direction was without the authority of W. *Baltimore* county court refused to direct the jury, that if they believed all the facts as given in evidence by both parties, that then the conduct and refusal of W operated in law to preclude D and W from recovering.

A vessel with a cargo of fleur on board belonging to D and W, citizens of the *U S*. sailed from *Baltimore* to *St. Thomas* in the *West Indies* in the month of October 1799, with a view and for the purpose of there assuming *Danish* colours, and a *Danish* character, and under them of proceeding on a trading voyage for the benefit and account of D and W. She arrived there in November 1799. and was there put under *Danish* colours as the property of J V, a *Danish* subject, and dispatched to *Jacmel* by directions of D and W, she still continuing to be their property. In November 1799, she sailed from *St. Thomas's* and arrived at *Aux Cayes* in the island of *Hispaniola*, about the 1st of December following. The cargo was then sold by E H, the agent of D and W, and a new cargo purchased with the proceeds thereof, which new cargo E H in the same month of December sent from *Aux Cayes* in the same vessel to *Curracoa* for account of D and W, from whence the vessel returned to *Aux Cayes* about the 1st of April 1800. E H, still acting for D and W, then purchased a new cargo of coffee at *Aux Cayes* for D and W, and put it on board the same vessel, and about the 20th of April 1800, dispatched the vessel and cargo from *Aux Cayes* back to *St. Thomas's*, consigned to N of the house of M and N, as his own property apparently, but in fact for D and W. The vessel and cargo arrived at *St. Thomas's* in May 1800, and were sold in August 1800, and the proceeds of sale paid to M as the partner of N for and on account of D and W. For the proceeds so paid to M an action of *assumpsit* was brought against him by D and W—*Held*, that the voyages from *Baltimore* to *St. Thomas's*, from *St Thomas* to *Aux Cayes*, and from *Aux Cayes* back to *St. Thomas's* were illegal, being contrary to the acts of congress interdicting commerce with any port or place within the territory of the *French* republic, or the dependencies thereof, or with any place in the *West Indies*, or elsewhere under the acknowledged government of *France*; and that D and W could not recover

1816.

Stewart
vs.
M'Intosh

| | | |
|---|---|---|
| To amount of premium of insurance paid on schooner *Holstein* by Mr. *John Imlay*, as per his account furnished | 780 | |
| To this sum due by Messrs. *David Stewart* and Sons, as per their account furnished Mr. *Edward Hall*, and which we stop out of *Holstein's* cargo, | 5,195 | 46 |
| To this sum paid in *St. Thomas's* on two bills of exchange drawn by us on *David Stewart* and Sons, and which they suffered to return protested | 460 | |
| To this sum accounted with Mr. *Edward Hall* for the balance of this account, | 8,677 | 13 |
| **Cr.** | **$16,555** | **59** |

| | | |
|---|---|---|
| By nett proceeds of sales of the cargo of coffee from *Aux Cayes*, as per sales rendered pr. Mr. *John Imlay*, dated 25th of August 1800 | 15,355 | 59 |
| By amount of schooner *Holstein* sold for, | 1,200 | |
| | **$16,555** | **59** |

Errors and omissions excepted.

*Aux Cayes*, 9th May 1802."

The plaintiffs also gave in evidence, that the said schooner *Holstein*, and the cargo, in the said account mentioned, belonged jointly and in equal portions to the house of *David Stewart* and *Sons*, and to the house of *Hillen & Williams*, which two houses (and who are the plaintiffs in this cause,) had jointly purchased said vessel and cargo, and were partners in that transaction, but in no other. That in the original purchase of said vessel, and her outward cargo, on her original voyage from *Baltimore* to the Island of *Saint Thomas's*, and in the transaction and management of the business relating to the original voyage, *David Stewart* and Sons were the agents of the owners, and as such consigned the vessel and outward cargo to the defendant and *Wood*, at the Island of *St. Thomas*, in the *West Indies*, from whence she was to have been sent to *Williams*, one of the plaintiffs, at *Jacquemel*, in the Island of *Hispaniola*, there to be under his direction and management. That the schooner was so dispatched by the defendant and *Wood*, but was prevented from arriving at *Jacquemel*, and got into the port of *Aux Cayes*, in the same Island, where a certain *Edward Hall*, acting by the authority of *Williams*, loaded her with a cargo of coffee, and sent her to *St. Thomas*, consigned to *Wood*, which cargo is the one mentioned in the account current herein before set forth; and that at the time of receiving the vessel and cargo, and the proceeds thereof, as stated in the above mentioned account, it was known to the defendant and *Wood* that both vessel and cargo belonged jointly and equally, to the plaintiffs. The de-

fendant then offered evidence to prove, that before the said account was made out and rendered as aforesaid *David Stewart* and Sons were indebted to the defendant and *Wood*, in the amount of $5655 46 as stated in said account, and in consideration thereof did expressly authorise and direct verbally the defendant and *Wood* to retain in their hands, out of the proceeds of the vessel and cargo, and in discharge of the said debt, the several sums charged by them in the said account, as having been by them so retained, and amounting together to the said sum of $5655 46. And further, to show that at the time when the said authority and direction were given to the defendant and *Wood*, by *David Stewart* & Sons, *Hillen & Williams* were indebted to *David Stewart* & Sons in a sum larger than the interest and proportion of *Hillen* & *Williams* in the said sum of $5655 46, and therefore that *David Stewart* & Sons had a just right to give the said authority and direction, the defendant produced and offered in evidence certain accounts between *David Stewart* & Sons, and *Hillen & Williams*, stated and signed by *David Stewart*, one of the plaintiffs. But the plaintiffs objected to the evidence so offered by the defendant, and to the said accounts, as competent to prevent the recovery of the plaintiffs. This objection the Court [*Nicholson*, Ch. J. and *Bland*, A. J.] sustained, and refused to permit the evidence or accounts to go to the jury. The defendant excepted.

2. The defendant then produced *Edward Hall* as a witness, who gave evidence that he, by authority from the plaintiff *Williams*, acting on behalf of all the plaintiffs, purchased at *Aux Cayes* the cargo of coffee shipped by the schooner *Holstein* to *St. Thomas*, and mentioned in the account first stated in the *first* bill of exceptions, and shipped it as aforesaid for their account and risk, the cost and charges of which shipment and cargo he charged to them in his account against them; which account he transmitted to the plaintiff, *Williams*. some time in the spring of 1800, very soon after the shipment was made; and that the account first exhibited in the *first* bill of exceptions. was rendered to him, the witness, by the defendant, about the time it bears date, a copy of which account he enclosed to *Hillen & Williams*, or *Williams*, some short time after he received the same from the defendant. That *Williams*, both before and after the rendition of said account to the witness, always alleged against the account rendered against the schooner and her owners, that the voyage from *Aux Cayes* to *St. Thomas*, ought not to be charged to the owners of the schooner, but was and ought to be considered as on account of the witness. But the witness insisted on his right to recover the same from said owners, and brought a suit against the plaintiffs, and did recover a verdict and judgment against them for the whole amount of said claim, in *Baltimore* county court, at March term 1808. That the defendant has never been in *Baltimore* since the beginning of the year 1800, till just

1816.

Stewart
vs
M'Intosh

about the time of the institution of this suit. That some time before the said account was rendered by the defendant, *Williams* inquired of the witness if he had ever brought the defendant to a settlement about the *Holstein's* business. The defendant then prayed the court to direct the jury, that from this evidence they might find that the plaintiff, *Williams*, assented to the application made by the defendant of the said sum of $5655 46, to the payment of the debt due to the defendant from *Stewart* and Sons. Which direction the court refused to give. The defendant excepted.

3. The defendant then gave in evidence, that after the account of *Hall* against the plaintiffs, charging them with the cost of the cargo shipped by him to *St. Thomas's*, was rendered by him to the plaintiff *Williams*, the said plaintiff did, on the part of the owners, object to the said charge, and refused to consider or accept the said cargo as the property of the plaintiffs, but insisted that it was the property of *Hall*, and did refuse to pay for it to *Hall*, and continued so to act and refuse until after the recovery against him, and the other plaintiffs, by *Hall*. He also gave in evidence, that *David Stewart* and Sons authorised and permitted the defendant to apply the said sum of $5655 46 to the payment of the debt due as aforesaid from them to him, but this direction was without the authority of *Hillen & Williams*. The defendant then prayed the opinion of the court to the jury, that if they believed the facts so given in evidence by the defendant and plaintiffs, as stated in this exception, that then the said conduct and refusal by the plaintiff, *Williams*, operates in law to preclude the plaintiffs from recovering in this action. This opinion the court also refused to give. The defendant excepted.

4. The defendant then gave in evidence, that the plaintiffs, in repeated conversations and correspondences, admitted that the schooner *Holstein* had been sent from *Baltimore* by *David Stewart* & Sons, by authority from *Hillen & Williams*, and for account of the plaintiffs, and belonging to them, under the name of *The Speculation*, to the Island of *St. Thomas's*, with a view and for the purpose of there assuming *Danish* colours and a *Danish* character, and under them of proceeding to the port of *Jacmel*, in the Island of *Hispaniola*, on a trading voyage, for the benefit and account of the plaintiffs. That the schooner, with a cargo of flour on board belonging also to the plaintiffs, accordingly sailed from *Baltimore*, for the purpose aforesaid, in the month of October, 1799, to *St. Thomas's*, and arrived there in the month of November in the same year. That both vessel and cargo were consigned by *David Stewart & Sons* to the defendant and *Wood*, by whom they were there put under *Danish* colours as the property of *Jeremiah Vernico*, a *Danish* subject, and despatch-

ed to *Jacmel*, in pursuance of the orders of the owners, and still continuing to be their property according to the original intention and plan. That the vessel and cargo accordingly sailed from *St. Thomas's* in the month of November 1799, and arrived at *Aux Cayes* in the island of *Hispaniola*, on or about the 1st of December following, and were there placed under the direction of the said *Edward Hall* by the plaintiff, *Williams*. That the cargo was immediately sold at *Aux Cayes* by *Hall*, for account of the said owners, and a new cargo purchased with the proceeds thereof, which new cargo *Hall*, in the same month of December, sent from *Aux Cayes* in the schooner to the island of *Curracoa*, for account of the said owners, from whence the schooner returned to *Aux Cayes* on or about the 1st of April 1800. That *Hall*, still acting for the owners under the authority of the plaintiff *Williams*, did then purchase a new cargo of coffee at *Aux Cayes*, for and on account of the said owners, and put it on board of the schooner; and on or about the 20th day of the same month, dispatched the schooner and cargo from *Aux Cayes* back to *St. Thomas's*, consigned to *Patrick Wood*, of the house of *M'Intosh* and *Wood*, as his own property apparently, but in fact for the plaintiffs, or in case of his absence, to a certain *John Imlay*, then the attorney in fact and agent of the said *Wood*, to be disposed of for and on account of the plaintiffs. That the said vessel, and the last mentioned cargo, arrived in *St. Thomas's* in the month of May 1800, and, *Wood* being then absent, were taken into possession and sold by *Imlay* as his attorney in fact, who in the month of August in the same year paid to the defendant the nett proceeds of the said sales as a partner of said *Wood*, for and on account of the plaintiffs, as stated in the account first herein before mentioned. He also gave in evidence, that at the time when the said schooner *Speculation* was dispatched from *Baltimore* to the island of *Saint Thomas's*, with the views and objects aforesaid, and during the several voyages of the said schooner as aforesaid, the plaintiffs were citizens of the *United States*, and residents therein. The defendant then prayed the direction of the court to the jury, that if they believed the said facts, then the voyage from *Baltimore* to *St. Thomas's*, from *St. Thomas's* to *Aux Cayes*, and from *Aux Cayes* back to *St. Thomas's*, were illegal, and that the plaintiffs could not therefore recover in this action. This direction the court gave. The plaintiffs excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued on the last bill of exceptions, before BUCHANAN, EARLE, JOHNSON and MARTIN, J.

*Martin, Winder* and *Mercer*, for the Appellants. The defence set up by the defendant in the court below was, that the voyages were illegal, and that although the amount in dispute was received by him as the agent of the plain-

1816.

Stewart
vs
M'Intosh

tiffs, yet that he had a right to retain it, because the plain-tiffs could not recover the proceeds of an illegal transaction. They contended—1. That the voyage, under which the proceeds arose, was not an illegal one under the acts of congress then in force. 2. That the money was received by the defendant at the island of *St. Thomas*, and that as he could not have objected there to the paying it over, he could not object here. 3. That the money was not received by the defendant in execution of the contract, as with that he had nothing to do, he being no party to it.

On the *first* point. The act of congress of the 13th of June 1798, *ch.* 70, interdicted commerce with "any port or place within the territory of the *French* republic, or the dependencies thereof, or with any place in the *West Indies*, or elsewhere, under the acknowledged government of *France.*" This act was to continue in force until the end of the next session of congress, which terminated on the 3d of March 1799. By the act of the 9th of February 1799, *ch.* 108, there was a similar interdiction after the 3d of March 1799. This act was to continue in force until the 3d of March 1800, when it expired. By the act of the 27th of February 1800, *ch.* 164, (10.) "all commercial intercourse between any person or persons resident within the *United States*, or under their protection, and any person or persons resident within the territories of the *French* republic, or any of the dependencies thereof, shall be, and from and after the second day of March next is hereby prohibited and further suspended," &c. The *seventh* section declares, "that the whole of the island of *Hispaniola* shall, for the purposes of this act, be considered as a dependency of the *French* republic." This act was to continue in force until the 3d of March 1801, "provided, however, the expiration thereof shall not prevent or defeat any seizure, or prosecution for a forfeiture, incurred under this act, and during the continuance thereof." The question arises under the act of 1799, which interdicted the trading to a place acknowledging the government of *France*. The island of *Hispaniola*, did not acknowledge itself to be under the government of *France*, and there is no proof that it was. It is not therefore embraced by the act of 1799. *De facto* the island was independent, of course the people denied the jurisdiction of *France*. The island having been named and included by the act of 1800 for the purposes of that act, shows that it was not embraced by the act of 1799. If any one of the voyages was legal, the judgment must be reversed.

On the *second* point. The money was received by the defendant at *St. Thomas*, and came within the laws of that island, and if he was bound to pay the money to the plaintiffs there, he is bound to pay it to them here. If he had been sued there, he could not have defended himself upon the ground that the money received was the proceeds of an illegal traffic interdicted by the *U. S.* The law of the place where the obligation or cause of action arises, is

1816.

Stewart
vs
M'Intosh

the law that is to govern. *Desobry vs. De Laistre*, 2 *Harr. & Johns.* 191. *Owings & Cheston vs. Nicholson & Williams*, (ante 66.) *Alves vs. Hodgson*, 7 *T. R.* 241. *Phelps vs. Kent*, 4 *Day's Rep.* 96.

On the *third* point. If the voyage was illegal, yet the defendant cannot take advantage of it. He received the money as an agent, and he is bound to pay it over. He was not a citizen of the *U. S.* and could not be affected by the transaction, if it was illegal. They cited *Cotton vs. Thurland*, 5 *T. R.* 405. *Jaques vs. Golightly*, 2 *W Blk. Rep.* 1073. 2 *Com. on Cont.* 112, 123. *Tenant vs. Elliott*, 1 *Bos. & Pull.* 3. *Farmer vs. Russell*, *Ibid* 296. *Faikney vs. Reynous*, 4 *Burr.* 2069. *Petrie vs. Hannay*, 3 *T. R* 418. *Whittingham vs. Thornborough*, *Prec. in Chan.* 20. *Barjeau vs. Walmsey*, 2 *Stra* 1249. *Lacausade vs. White*, 7 *T. R.* 531. *Wilkinson vs Kitchin*, 1 *Ld. Raym.* 89; and *Alcinbrook vs. Hall*, 2 *Wils.* 309.

*Harper*, for the Appellee. The legal principles relied upon for the appellants will not be contested; their application to this case however is denied. The laws might always be violated by the intervention of an agent, if the doctrine contended for on the other side was to prevail. The act of Congress of 1799, was further to suspend, &c. and it interdicted the trade *1*. With old *France*. 2. Her colonies; and 3. Places conquered or occupied by her, &c. 1. Any port or place within the territory of the *French* republic. 2. Or, of the dependencies thereof. 3. Or, any place in the *West Indies*. The territory of *France* might include dependencies and places conquered by the *French* arms, and remaining under the government of *France*. 1. The only question is, whether *St. Domingo* in 1799 came within either of the above descriptions? Was *St. Domingo* then a dependency of *France?* This cannot be denied. Our courts are bound to take notice of the political state of foreign countries. To do so they must resort, where the fact is doubtful, to what our government consider to be the particular situation of any country. As to the people of *St. Domingo* attempting to become independent, it is not to be noticed by our government or our courts, as that island has never been acknowledged to be independent by *France*. If our government were to acknowledge the independence of *St. Domingo*, it would be involving the country in a dispute with *France*. The public acts of governments are to be taken notice of by courts. If there is a treaty between *Great Britain* and *France*, and one of them cedes to the other an island, &c. then our courts are bound to notice such treaty, because our government takes notice of it. But where there is a contest between the mother country and its colony, our government stands neuter, and considers the colony as under the government of the mother country. 2. There is a great distinction between the appellee and the agents and stake-holders in the several cases cited by the counsel for the appellants. Here

1816.

Kenner & Henderson
vs
Kennedy & Cox

the appellee was the agent of the parties, and was apprized of the illegal voyage, and he was privy to the illegal transaction, aiding and assisting in it; and as such agent, and with such knowledge, the money now demanded of him came into his hands. He cited 2 *Com. on Cont.* 109; and *Steers vs. Lashley*, 6 *T. R.* 61.

THE COURT concurred with the court below in the opinion stated in the last bill of exceptions.

BUCHANAN, J. dissented.

JUDGMENT AFFIRMED.

---

1816.
JUNE.

KENNER & HENDERSON vs. KENNEDY & COX.

K and H of *New Orleans*, having purchased a quantity of cotton for K and C, drew bills on them for the amount, which being protested for non payment K and H were obliged to pay the amounts thereof, with 10 p c damages, according to the usage and custom prevailing in *New Orleans*. They afterwards brought their action against K and C for the amount paid by them for the cotton, the suit was referred, and the arbitrators not taking into consideration the 10 p c damages, awarded the amount to be paid by K and C, to K and H, for which a judgment was tendered, which was afterwards satisfied. K and H afterwards brought an action against K and C, to recover the 10 p c damages—*Held*, that they were not entitled to recover

APPEAL from *Baltimore* County Court. *Assumpsit* on sundry bills of exchange drawn by the plaintiffs, (now appellants,) on the defendants, (the appellees,) and by them accepted, &c. The general issue was pleaded.

At the trial the plaintiffs proved, that the defendants, and a certain *John Sherlock*, all of whom resided in the city of *Baltimore*, in the year 1806, authorised and empowered the plaintiffs, who resided in the city of *New Orleans*, to purchase, on their account, a quantity of cotton, amounting to the sum of ———, and to ship the same to *Lees & Sherlock*, of *Liverpool*. That the plaintiffs made the purchase, and drew bills on the defendants to reimburse them for part of the money expended by the plaintiffs in making the purchase; which bills were accepted by the defendants, and afterwards duly protested for nonpayment; which bills they offered in evidence. Of which protests due notice was given to the plaintiffs. The plaintiffs further offered evidence, that after the bills were protested, for nonpayment they, as the drawers of the bills, paid the amount thereof, with ten *per cent* damages, to the respective holders; and they further offered evidence, that according to the usage and customs of merchants prevailing at the city of *New Orleans*, the holder of a protested bill of exchange drawn at *New Orleans*, on a person in any one of the *United States*, is entitled to receive from the drawer of the bill ten *per cent.* damages on the amount of the bill. And the plaintiffs stated to the court and jury, that he present suit was instituted solely to recover ten *per cent.* damages on the said bills of exchange, with interest and costs thereon, amounting together to $1,227 92. The defendants then proved, that the plaintiffs to October term 1808 instituted a suit in *Baltimore* county court against these defendants, and the said *Sherlock*, to recover the amount by the plaintiffs expended in making the said purchase of cottons, with interest thereon. That the defendants and *Sherlock* appeared to that suit, and after-