JOSIAH DUNHAM *vs.* HERBERT W. PRESBY & others.

Suffolk.  March 26, 1874.  March 28. — May 6, 1876.  DEVENS & LORD, JJ., absent.

A bill in equity cannot be sustained by one member of a partnership against his co-partners, for an account of profits resulting from an illegal trading with inhabitants of states declared in insurrection against the United States.

The court will not entertain jurisdiction of a bil' in equity for an account of profits resulting from an illegal trading with inhabitants of states declared in insurrection

against the United States, if the illegal character of the transaction appears in evidence, although it does not appear on the face of the bill, and is not set up in the answer.

BILL IN EQUITY for a settlement of the affairs of a partnership. An argument was had upon the questions made by the pleadings in March 1874, by *G. F. Homer*, for the plaintiff; *W. Colburn*, for the defendant Presby; and *W. Gaston*, for F. W. Bird, another defendant; and in March 1876, upon the suggestion of the court, upon the question of the legality of the transactions between the partners, as appearing upon the master's report, by the same counsel, except that *E. C. Bumpus* appeared in the place of *W. Colburn* for the defendant Presby. The case is stated in the opinion.

ENDICOTT, J. It appears from the bill, answers and report of the master that in April 1864 the plaintiff with the three defendants entered into a partnership to hire a store at Norfolk, Virginia, and carry on a wholesale and retail trade in such goods as would command a ready sale. Each partner was to contribute fifteen hundred dollars to the capital stock, and share equally in the profits and losses of the business. The defendant Presby was to have the control and management of the business at Norfolk, the others continuing to reside in Massachusetts, and it is to be presumed, from a settlement afterwards made between the parties, that Presby was also to be allowed for his services and expenses at Norfolk as the managing partner. There is nothing in the papers before us to show, or from which it is to be implied, that the business thus entered upon was not perfectly legitimate and legal.

In the month of May following, and while Presby was at Norfolk, one Johnston, then acting as adjutant to the general in command, suggested to Presby that he could make money by sending goods into that part of North Carolina known as the "neutral territory," and exchange them for cotton, provided that the assistance of one Harney could be obtained, who was well acquainted with that part of North Carolina and competent to conduct the business. In pursuance of this suggestion, Presby met Johnston and Harney. Johnston then proposed that Presby should furnish the capital for the enterprise, that he, Johnston, should procure from the general in command the permits neces-

sary to legitimate the traffic, and should receive for that service one third of the net profits; that Harney should superintend the purchase of the cotton and its transportation to Norfolk, and for so doing should also receive one third the net profits; and that Presby should be entitled to the remaining third. It is to be presumed from the character of this transaction, and the fact that permits of some kind were necessary to carry on this trade, that the cotton was to be obtained outside the military lines of the United States forces. Presby thought the terms unreasonable, but entered into the arrangement with Johnston and Harney. On his return to Boston during the same month, he reported to his three associates in the original partnership the enterprise in which he was to engage with Johnston and Harney, but at Johnston's request he did not mention his name. His associates, understanding fully all the terms and conditions under which the enterprise was to be conducted, authorized him to embark in it on joint account, each agreeing to furnish his share of the necessary capital.

We cannot but regard this as a separate and distinct undertaking, wholly apart from the purposes of the original partnership, requiring not only a new advance of capital, but, from the nature of the arrangement and the division of profits to Harney and Johnston, requiring separate accounts to be kept, not necessarily connected with the original partnership accounts.

In June following the parties again met in Boston, and it was agreed that Presby should take an account of the stock of goods in the store on July 1, and purchase them at cost prices, that the company should be dissolved on that day, the undertaking abandoned, and that Presby should forward and sell all cotton then on hand. The account of stock in the store was taken by Presby, and he also had on hand forty-six bales of cotton purchased by Harney in the neutral territory under the agreement. The cotton was shipped by Presby for New York, and the ship sailed from Fortress Monroe on July 10. On July 11 it was reported in Norfolk that a cruiser of the enemy was off the capes, and Johnston and Harney, being alarmed, proposed to sell their interest in the profits to Presby, saying they should sell to some one. Presby paid Johnston $3000, and Harney $2500, for any interest they might have in the profits of the enterprise. This purchase

he made, as he supposed, on his own account, thinking he had
no right to make the purchase for his associates.  The cotton was
sold in Boston and a profit obtained of $17,202.05, and Presby
having notified his associates that he was ready to settle, they
all met in Boston on July 30.  The accounts of the goods in
store July 1, of sales of the cotton and of cost and expenses
were exhibited, but no books or vouchers were produced.  Some·
expenses, incurred by individual· partners for the common ben-
efit, and payment for Presby's services were deducted.  The net
profits in the cotton having been ascertained by the sale, one
third thereof was divided into four equal parts, and to each part
was added the money contributed by each party, and one fourth
of the profits of the sale of goods at Norfolk.  For this sum
total so obtained, Presby gave his check, and took a receipt in
full from his associates.  He did not then disclose to them, nor
had he before, his settlement with Johnston and Harney, regard-
ing that as a matter which did not concern them.

   This bill, filed by Dunham against Presby and his· two other
partners, alleges the general partnership, and also that there had
been a partial settlement, but that Presby had not accounted
for all the partnership property in his hands, and prays for
a full account and disclosure in·regard to the partnership busi-
ness.   The several defendants answer that there has been a
full settlement, relying on the settlement of July 30, 1864.
Neither bill nor answers disclose the character of the transac-
tions in regard to the cotton : that appears for the first time in
the master's report.   It is not now contended that any account
connected with the original partnership in relation to the store
is outstanding ; the only matter at issue relates to the profits
which accrued to Presby upon sale of the cotton in Boston,
through his purchase or settlement with Johnston and Harney
of their interest.   All other matters were adjusted July 30.˙  As
the case stands, the bill seeks only to compel a distribution
among the partners of the profits in the hands of Presby, arising
out of the distinct and separate agreement under which the cot-
ton was procured.

   The question at once arises upon this statement, whether this
is not an attempt to enforce an illegal agreement to carry on
trade and commercial intercourse within localities beyond the

lines of military occupation by the United States, and to divide the proceeds of that trade between the parties engaged in the unlawful undertaking. It sufficiently appears that, by means of the permit obtained by Johnston, and through the agency of Harney, this cotton was obtained beyond the lines of the military forces of the United States. Such a transaction was strictly prohibited by the laws of the United States, and the regulations of the treasury made in pursuance thereof, which were in force at the time. U. S. St. 1861, *c.* 3, § 5. Regulations of Treasury, September 11, 1863, rule VII. No public officer had authority to legitimate such a traffic; and the permit of a military commander, while it might enable the parties to carry it on, could not render it lawful. *McKee* v. *United States*, 8 Wall. 163. The cotton so obtained could have been seized by the United States, and the parties engaged in the enterprise were violating the law in trading with the enemy. As this question was fully considered in *Snell* v. *Dwight, ante,* 9, it is unnecessary to enter into a further discussion of it.

Nor is it material that the defendants do not set up the illegality in their answers, as no waiver by them or consent of parties can oblige a court to determine their rights under an illegal contract. *Cardoze* v. *Swift*, 113 Mass. 250. *Evans* v. *Richardson*, 3 Meriv. 469. If the money thus received by Presby was not partnership property, in which his partners were entitled to share, of course the bill must be dismissed. If on the other hand, as contended by the plaintiff, the money so received belonged to the partnership, to be accounted for by Presby as the profits of the joint undertaking, it is clear that it can only be reached by the plaintiff through the illegal agreement by the terms of which he is entitled to receive one quarter part of the profits coming to the partnership from the unlawful enterprise. The case falls within the rule laid down in *Armstrong* v. *Toler*, 11 Wheat. 258, and *Thomson* v. *Thomson*, 7 Ves. 470, that no action can be maintained on such a contract to enforce its obligations or secure its fruits to either party. The cases bearing on this question are collected and considered in *Snell* v. *Dwight, ante,* 9.                                    *Bill dismissed.*