# CIRCUIT COURT OF BALTIMORE CITY

Filed May 1, 1889.

PRUNTY
VS.
BASSHOR ET AL.

*James McColgan* and *John V. L. Findlay* for plaintiff.

*John P. Poe* for defendants.

PHELPS, J.—

For more than twelve years these parties were associated in a manufacturing enterprise in this city, and their multifarious and complicated dealings

extended over a large part of the United States. During all that time there was never a balance sheet nor a statement. As a natural consequence, for nearly four years they have had on their hands this costly and so far fruitless litigation. Eighteen hundred pages of testimony, a wagon load of exhibits, and a $1,750 auditor's report (not objected to as excessive by either side), compose the monument they have raised over their own imprudence. Among other moral lessons the case teaches, it well illustrates the homely maxim of common life, "short settlements make long friends." Others there are, still more impressive. The leading principle involved in the case is one of public policy, and it is also one of grave moment, infinitely transcending, in its interest to society, any individual rights at stake.

The case comes up on the plaintiff's exceptions to an auditor's account. The account is credited with $63,233.92 by sales of "Prunty Relief Valves, &c." On the debt side appears, among other items, one of $4,704.76 for "commissions." This amount is to be increased (if the auditor is correct), by the addition of a number of other items of the same kind found in the abstract filed as part of his report, and included in the bulk of the largest item therein. There is nothing whatever in the pleadings to explain these charges.

The bill, answer, cross-bill, amended and supplemental cross-bill, and the cross-answer, are all silent with regard to these "commissions," for what or to whom they were paid.

From the exhibits and correspondence in evidence, and from other testimony, it appears that, in order to make sales of the machines at the prices charged for them to the municipal corporations of various States, for the use of their fire departments, the usage of the parties to which both the plaintiff and the defendants were privy, was to effect an understanding with the chief engineers of those departments, by which said officials were to receive contingent compensation in the event of the machine being accepted, generally fixed at the rate of twenty per cent. on the price of each machine sold through their influence, in some cases less, and in some cases more. It is not necessary to quote the testimony at large. There is a great deal of it, running all through the record. Counsel on both sides during the argument admitted that such was its effect. Particular reference may be made to Prunty's testimony, pp. 1642, 1665, 1667, 1668, 1672, 1679, 1698. Basshor, pp. 446, 515, 677, &c., 728; Stebbins', pp. 1272, 1277, 1279, 1283, 1284, 1288, 1329, 1330, 1349, No. 2, 1350, 1538.

In most cases the contracts were made by the plaintiff, as the traveling salesman of the defendants. In some cases they were made by the defendants, or one of them, directly. In all cases they were made with the knowledge and consent of all parties.

There are exceptional cases in which the sales appear to have been legitimate. The dealings with the City of Baltimore on account of its fire department, so far as the evidence goes, were, with one disputed exception, of this character. Prunty had been an employee in the Baltimore fire department. He and his invention were well known to its officials. Before his connection with the defendants, in October, 1873, a number of his relief valves were actually in use upon the steam fire engines of this department. He himself naively testifies that there was "no occasion" for commissions here. (Page 1679.)

There was one transaction of $100 with Spillman in the early part of 1876 about which the testimony is conflicting. Spillman was chief engineer of the Baltimore City Fire Department, until the close of that year. He swears positively that the $100 was a "personal loan" from his friend Basshor. It never happened to be repaid by Spillman. It never happened to be demanded by Basshor. It appears as one of the charges against Prunty's a payment made on account of the concern. That is the view of it to which both defendants stand committed, as a business operation. Basshor, who paid the money, is more explicit. He swears that the $100 was paid "as commissions for the sale of valves made to the Baltimore Fire Department." These are his exact words, as taken down by the auditor, page 728. He further says that another $50 had been previously paid Spillman on Prunty's order.

Prunty admits the payment of the $50, but swears it was for Spillman's "services in New York," and not as commissions on any machines sold in Baltimore. He positively denies any

knowledge whatever of the $100 payment, and it is in this connection that he observes there was "no occasion" for commissions here. He says the $50 charge is correct, but objects to pay his half of the $100.

It is not the least of evils incident to crooked transactions that they impair the credibility of all parties concerned in them. There is nothing for the Court to do here but to believe the two witnesses who swear to the innocence of all three, or else the one who swears to his own guilt and the guilt of the other two. The solution of this problem may be reserved until it is settled whether this and other issues are not merged in a greater question behind them.

The plaintiff in his bill claims an account, and payment, under the articles of agreement, of one-half the net profits arising from the manufacture and sale of the relief valves invented by him, and also a balance charged to be due as unpaid salary. The amount of this salary was not fixed by the agreement, but was left to be "hereafter agreed on." No agreement having been arrived at as to salary, the plaintiff is now in effect suing as upon a "quantum meruit," so far as the item of salary is concerned.

The questions to be first considered are—1st. Whether the plaintiff can enforce payment for salary for services which included sales, by the method indicated?

2d. Whether he is entitled in equity to an account of the profits derived from such sales?

The first question is not at all difficult of solution. By all the authorities it is plain that compensation for services of that nature cannot be recovered either at law or in equity.

Services, a material part whereof consists in the corrupt solicitation of public officials, cannot be recognized by any Court as a lawful subject for compensation.

Greenhood Pub. Pol., 593, 4. (See 399, &c.)

Tool Company vs. Norris, 2 Wal. 54-58.

It is no answer that the objection is not raised by the pleadings.

Dunham vs. Presly, 120 Mass. 285.

Coppell vs. Hall, 7 Wall. 558.

Greenh., P. P., pp. 124-126.

Nor that there is nothing on the face of the written agreement which imports that any improper means were to be used in the introduction and sale of machines.

Riley vs. Jordan, 122 Mass. 231, 233.

Sherman vs. Wilder, 106 Mass. 537.

1 Bates Ptnp. Sec. 115.

Nor that the officials corrupted belonged to municipal corporations outside the jurisdiction of the State.

Oscanyan vs. Arm Co., 103 U. S. 261, 277, citing Watson vs. Murray, 23 N. J. Eq. 257.

Nor that the improper services were so blended and confused with services which were innocent that no apportionment can be made. In such cases, "The whole is a unit and indivisible. That which is bad destroys that which is good, and they perish together."

Trist vs. Child, 21 Wall. 441, 452.

2. The other question as to profits will require more extended consideration. The authorities here are somewhat conflicting. The case of Brooks and Martin, 2 Wall. 70, was relied upon in argument upon the one side, and conceded upon the other as conclusive to the effect that where illegal transactions have become accomplished facts and the proceeds are found in the hands of a partner, he cannot refuse to account for them to a co-partner upon the footing of such illegality. In the case at bar, the technical relation of partnership does not exist,, but it may be allowed for all present purposes that the same principle which would apply to a partnership applies also to associates in a common enterprise whose mutual dealings are the proper subject matter, if legitimate, for an account in equity. Here the plaintiff and the defendant firm are co-owners, each having one undivided half interest in the same patent right, their dealings have extended over a period of more than twelve years, during which time no settlement has been made, their accounts are voluminous, involved and intricate, and their vast accumulation of books and papers required of the auditor the labor of 13 months to state the account. In what has just been suggested there is apparent foundation for the decree for an account passed in the cause.

Ordinarily, when opposing counsel are found to agree in allowing a proposition, either of fact or law, Courts are not disposed to inquire further. It is one of the peculiarities of this case, however, that all parties suppose

they are interested in having this account taken. The plaintiff alleged in his bill, and still claims, that a large balance is due him. The defendants readily submitted to the interlocutory decree, and by the testimony they produced succeeded in convincing the auditor that the plaintiff is actually their debtor in the sum of $2,013.19. Hence the circumstance that the defendants' counsel conceded the application to this case of the doctrine referred to, was not calculated to impress the Court as strongly as it certainly would have done had the situation been otherwise. As it was, there was really no concession against supposed interest at all. From this consideration, as well as from the nature of the question involved, it being one of public policy and therefore of much wider scope and graver import than any proprietary interests at stake, the duty was devolved upon the Court of satisfying itself as to the correctness of the proposition thus apparently conceded. The proposition was that the doctrine of Brooks vs. Martin, 2 Wall. 70, was applicable to this case. Investigation has satisfied me that the facts of the two cases are broadly distinguishable, and that they call for the application of entirely different principles.

Before proceeding with this examination it is necessary to carry into it a clear conception of the precise nature of the transactions out of which the profits in question accrued.

Generally, in a corrupt series of transactions like those under consideration, there is a process of development. Several successive stages are to be noticed. There is first the initial understanding or bargain between the associated contractors to endeavor to secure city contracts by corrupting city officials. Next follows the approach to the city official and the corrupt bargain with him. These two contracts are, both of them, unquestionably and absolutely void. Then comes the harvest, the fraudulent sale to the city, loaded with boodle. One of the parties to this contract, the municipal corporation which is to pay the money, is the innocent dupe.

Whether this contract is, like the others, absolutely void, is of little moment; it is at all events voidable at the option of the defrauded purchaser upon the terms usual in cases of rescis-sion. There is authority for the proposition that such contracts are absolutely void and liable to cancellation without even return, refunding, or tender. State vs. Cross, 38 Kan. 696, 701, 2.

It is unquestionably a fraudulent contract, procured by corrupt and criminal means, and for all the purposes of this discussion may be treated as if technically void. No officer of any public municipal corporation in this State, from the mayor down, has authority to sanction or ratify such contracts, and it will not be presumed that a different law prevails elsewhere.

Lastly, the scheme being up to this point a success, comes the division of the realized fruits between the original projectors of it, they having fallen out over the plunder. It is at this stage that the intervention of a Court of equity is now invoked to assist the confederates in making the division they have not been able or willing to make for themselves.

As to the precise nature of this application, two different views are entertained. One is, that it is either strictly, or in effect, an application to enforce the original illegal contract. The other is that the suit for account and division is merely collateral to, and therefore something distinct from the original contract. It is not essential to the determination of this case that this Court should commit itself to either one of these opposing theories. For all the purposes of this discussion, and for reasons that will appear further on, the latter will be assumed.

But while that view will be assumed *argumenti gratia*, it may be proper in passing to offer one or two reflections as to the other, in order to get a firmer grasp on the whole subject.

It has been already seen that the initial contract in such a case as the present, the main spring of the whole series, is the primary understanding or bargain between the associated contractors (the parties now before this Court), to endeavor to secure city contracts by corrupting city officials. This void contract easily resolves itself upon analysis into two elements. The first relates to the dealing with the third party, the public official. The second relates to the resulting dealing or "deal" between the original contracting parties. That this is true, is obvious

from the fact that there would be no advantage, that is, no joint advantage, in the first element, unless coupled with the second. Parties never enter into such combinations unless mutual profit is clearly understood. In this view, the ultimate division of the prospective proceeds must be taken as contemplated, and in fact stipulated for in the original contract. In this view the contract is to be considered as executory until both its elements are gratified. Hence the suit for an account and division is said to be an application, in effect for the enforcement of an illegal and void contract.

A good illustration of this view is to be found in Roman vs. Mali, 42 Md. 513, where the original fraudulent arrangement between the parties to cheat the creditors of one of them, was construed to practically embrace within its terms a provision for the ultimate re-conveyance to the fraudulent grantor by the fraudulent grantee, and upon this principle the suit for the declaration of a trust and for an account was held to be *in effect* an application for the enforcement of the void contract.

42 Md. 532.

[There is nothing in the minority opinion opposing this view. The dissent went upon the ground that higher considerations of public policy demanded the enforcement even of a fraudulent contract as against the instigating and devising attorney, refusing to disgorge.

42 Md. 552, 3.]

In the case at bar there was an express written agreement for the equal division of net profits.

If the principle of Roman vs. Mali is applied to the case now before the Court, the end of controversy is of course reached at once. But inasmuch as that principle apparently antagonizes the doctrine of Brooks vs. Martin, which case, with an important reservation to be hereafter noted, has been recognized in another Maryland decision to be cited in its place, this inquiry will start from the other point of view, and in order to avoid apparent conflict of Maryland authority, will assume throughout that the present suit is not in fact to enforce an executory void contract, but merely to derive a benefit collateral to, or resulting from, its complete execution. In other words,

the effort will be to show that whichever view be adopted, the practical result will be the same.

Prunty's relief valve is unquestionably an ingenious contrivance, and one of great utility to all steam fire engines. One would suppose that a machine of such obvious merit would sell itself. But whether it was that competition was encountered, or that the price put upon it was found too high by purchasers, (the selling price was $120 to $150—the cost of production was $15 to $20), it was deemed necessary to resort to some adventitious aid in order to secure a market. There is but little demand for such a machine outside of municipal corporations equipped with a steam fire apparatus. The persons whose voice is most influential in determining as to what improvements are required for such apparatus are naturally the chief engineers of the several fire departments. If those officials are disinterested, their aim will always be to secure the greatest possible efficiency or service at the least possible expense to the public treasury. If, on the other hand, they have a direct pecuniary interest in the contracts they make or recommend, the interest is adverse to the public by whom they are employed and paid, and, to use a common expression, the public is "sold out." The official who sells his influence accepts a bribe, and the person who offers the money, offers a bribe.

The Constitution of Maryland, Art. 3, Sec. 50, requires the General Assembly to provide by law for the punishment, by fine, or imprisonment in the penitentiary, or both, in the discretion of the Court, of any person who shall bribe, or attempt to bribe, any executive or judicial officer of the State of Maryland, or of any municipal corporation in the State of Maryland, or any executive or judicial officer of such corporation, in order to influence him in the performance of any of his official duties; and also to provide by law for the punishment, by fine or imprisonment in the penitentiary, or both, in the discretion of the Court, of any of said officers, or members who shall demand or receive any bribe, fee, reward, or testimonial, for the performance of his official duties, or for neglecting or failing to perform the same.

The same section further declares that "any person convicted of such offence shall, as part of the punishment thereof, be forever disfranchised and disqualified from holding any office of trust, or profit, in this State."

The law passed in pursuance of this constitutional mandate will be found in its proper place in the Criminal Code of the State, Art. 27, under the head of "Bribery," Sec. 23.

Now, let the comparison be made between a crime, or, more technically, a misdemeanor, thus made punishable with fine and the penitentiary, and in addition branded by organic law with the infamy of disfranchisement, and the mere violation, not criminal, nor even penal, of a statute to prevent the buying up of soldiers' bounty land claims, which was the illegal business of the partnership between Brooks and Martin. It is quite true that so far as its effect in vitiating the original contract is concerned there is no distinction at this day between malum *in se* and malum *prohibitum*. The contracts of the partnership with the soldiers were absolutely void, just as the contracts in this case to pay commissions to the engineers were void. But when we once get away from the original contract, and are led into other matters connected with it, or arising out of it, the distinction between innocence and guilt is one that neither the conscience of mankind nor a Court of justice can avoid regarding. The case of Aubert vs. Maze, 2 B. & P. 371, is commonly referred to as the leading case in which the old distinction was abrogated. Bank vs. Owens, 2 Peters 588-9. Aubert vs. Maze was decided in February, 1801, and yet in the succeeding June the same Court, when called on to decide upon a matter collateral to the void contract, emphatically recognized the distinction between cases of void contracts which involved moral turpitude and cases which did not. That was a suit brought to recover back the money advanced upon the void contract, and in allowing recovery the Court said:

"In the present transaction there was no moral turpitude whatever, and though it has been sometimes held that where there is moral turpitude in the contract the Court will not allow the party who has advanced money on such a contract to recover it back, yet no argument of that sort can be urged in the present case." This was said by Lord Alvanly, C. J., and Heath, J., concurring added, "Undoubtedly, there may be cases where the contract may be of a nature too grossly immoral for the Court to enter into any discussion of it; * * * but when nothing of that kind occurs, there ought to be a *locus penitentiæ*."

Tappenden vs. Randall, 2 B. & P. 467.

It is well known that a great change has taken place in modern times in the opinion of mankind as to the ethics of the slave trade. In the early dawn of the present century, and in the State of South Carolina, a bill for an account was filed against a consignee of negroes shipped from Africa, in violation of statute law, and by him sold, and it was held that the agent could not refuse to account for the proceeds, under the excuse of the illegality of the original transaction. But the Chancellor added, significantly:

"I will not say that there may not be cases where the transactions may involve so much moral guilt that courts of justice would not suffer themselves to be polluted with them, directly or indirectly, but I do not think that this is one of these cases."

Anderson vs. Moncrieff, 3 Des. 132.

We here find the same distinction taken by this eminent tribunal (reflecting the moral lights surrounding it at the time) that was taken by the English Court which is supposed to have led the way in abrogating the distinction between *malum in se* and *malum prohibitum*. When you take a step away from the original contract and come to consider whether you will allow the money to be recovered back, or whether you will enforce an accounting for the fruits of the illegal transaction, the question of the degree of guilt, the question of moral turpitude or not, the question of exemplary effect upon the public mind, the question, in short, of public policy, will of necessity materially influence the decision.

That this must be so will be made apparent by a simple illustration. Take the traditional case of the highwaymen reported in 2 Pothin on Oblig. (Evans) 3 under the name of Everet vs. Williams, one of whom filed a bill on the equity side of the Court of Exchequer against his "pal" for an account of the proceeds of sundry watches, purses, horses, saddles, rings, swords,

canes and other commodities, acquired by their joint "dealing" with divers parties on Hounslow, Heath, Bagshot and elsewhere. The bill was dismissed for impertinence, the solicitor fined for contempt, all traces of the proceeding were expunged from the records of the Court and both parties were afterwards executed. Whether this case be real or fictitious, it is found commonly cited as an illustration in point, by Courts and text-writers of the highest authority.

1 Lind Ptnp. 94 note.
1 Bates Ptnp. Sec. 119 note.
Wald's Pollock 235 note.
Sykes vs. Beaden, 11 Ch. D. 195.
Ashlurst vs. Mann L. R. 20 Eq. 230.

Where, it may be asked is the Court of any country which would entertain a suit for an accounting between a gang of burglars, or counterfeiters, or receivers of stolen goods, or keepers of a bawdy house? Never would such a bill be contemplated for a moment, even although all the "illegal transactions" had become "accomplished facts," the stolen watches, all sold and converted into other securities, the unclean proceeds remaining in the hands of the defendant in the innocent shape of "lands, money, notes and mortgages, the results of the partnership business, the original capital for which plaintiff had advanced." (2 Wall. 80.) Would a Court in such cases as those supposed, ask the question put by the Supreme Court in 2 Wall. 80? "Does it lie in the mouth of the partner who has, by a fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldiers?" It would most assuredly be held that such an expression as "lie in the mouth of the defendant" did not belong to the literature or logic of this department of jurisprudence, and that even if the defendant made no objection, or even agreed expressly with his accomplice to leave to the arbitrament of a Court the division of the booty, whatever shape it may have been made to assume, the Court would of its own motion decline the disgraceful umpirage.

Oscanyon vs. Arms Co., 103 U. S. 261, 268.

The Court in such cases never troubles itself as to what may or may not "lie in the mouth" of either of the confederates. It looks beyond the interests of the immediate parties to the infinitely greater interest of the public. In the language of Lord Mansfield, so often cited in this connection that it has become a legal classic: "The objection that a contract is immoral or illegal as between plaintiff and the defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake however that the objection is ever allowed, but it is founded on general principles of policy which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may say so. The principle of public policy is this: *Ex dolo malo oritur non actio.* No Court will lend its aid to a man who founds his cause on action upon an immoral or illegal act. If from the plaintiff's own stating, or otherwise, the action appears to arise *ex turpi causa*, or the transgression of a positive law of the country, then the Court says he has no right to be assisted. It is upon this ground the Court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

Holman vs. Johnson, Cowp. 343.
1 Lind. Ptnp. 104, 105.

The defense is not a protection to defendant, but a disability of plaintiff. 101 Mass. 367.

The defense is allowed, not for the sake of the defendant, but of the law itself. Coppell vs. Hall, 17 Wall. 558, 103 U. S. 268; Roman vs. Mali, 42 Md. 513.

It will be observed that the language of Lord Mansfield applies primarily to cases wherein there is no distinction between *malum in se* and *malum prohibitum*. The authorities which will now be introduced show that the Courts still recognize and act upon that distinction in cases like the one at bar, where the void contract itself is not the immediate cause of action, but the effort is to obtain an advantage arising out of its execution.

Such a case was that of State vs. Baltimore and Ohio Railroad, 34 Md. 344, decided avowedly upon the principle announced in Brooks vs. Martin, 2 Wall. 70. The Court of Appeals first assumed, for the sake of argument only, the unconstitutionality of a railroad tax which might be provisionally called a capitation tax on passengers, and even on that assumption held that

the railroad which had collected the money from its passengers could not refuse to account for it to the State, by setting up the illegality of the tax. They then proceeded to demonstrate that the tax was not a capitation tax, and was not at all in violation of the Constitution of the United States, but with this branch of the decision we are not now concerned.

What is important now to notice is that after referring in general terms to the distinction "between suits to enforce illegal contracts and those asserting title to money arising from them," the Court then proceeds to examine "more particularly the nature of the arrangement between the State and the railroad company to see in what its supposed unconstitutionality is alleged to consist. There is no pretence," says the Court, "of any intentional violation of the Constitution, nor is there any express provision of that instrument to which the State laws are repugnant; it is said they are in conflict with its general scope and spirit. This is then not a case of *turpis contractus.*" 34 Md. 264.

It was from this standpoint thus advisedly chosen by the Court that the relations of the parties were viewed throughout. The supposed void contract was first investigated to ascertain whether there was in it any taint of moral turpitude. Had such been discovered, the unavoidable inference is that the Court would have washed its hands of the whole business. The language used by the Court is too plain to admit of any other construction. But the preliminary investigation having satisfied the Court that the case was at its very worst, nothing more than an innocent and unintentional mistake of law, and of rather intricate constitutional law at that, the Court went on to decide that a defendant, under such circumstances, could not refuse to settle by setting up such an illegality.

It might perhaps be going too far to claim the above case as an express committal of the Court of Appeals to the distinction or qualification of the case of Brooks vs. Martin adverted to, but at the same time, it must be admitted that the implication is so strong and clear as to evince at least the unmistakable tendency of the Court in that direction. Unquestionably, there was in the mind of the Court the

natural ineffaceable discrimination which conscience makes between guilt and innocence, the same which was present to the Court of Common Pleas in Tappenden vs. Randall, 2 B. & P. 467 and to the South Carolina Chancellor in G. Des. 132, already cited. Unquestionably the whole drift of the decision in 34 Md. shows that the jurisprudence of Maryland is fully in accord with that of New Jersey, Virginia, Illinois, Indiana, North Carolina, Massachusetts, Iowa, Nebraska, Texas and other States, as will shortly be seen, in refusing to extend the doctrine of Brooks vs. Martin to any case of accounting for the fruits of a void contract, involving criminality, tainted with moral turpitude, or in flagrant violation of public policy.

The leading cases, and those most frequently cited, come from New Jersey, where it has been held that a "Court of equity will not sit as the divider of gains which are the proceeds of crimes of frauds involving moral turpitude." This was said of a case where the fraud was that of an agent to buy, becoming himself the vendor.

Todd vs. Rafferty, 30 N. J. Eq. 255.

The same principle had been previously applied to a bill filed by a partner in a lottery firm against his copartners for a sale and distribution of proceeds, even although the partnership contract was made in a State where lotteries are legal, and it was held no answer that the suit was not to enforce an illegal contract, but simply to compel an account of profits already made, the Court observing that such distinction cannot be invoked when the illegal act is also a misdemeanor punishable by fine or imprisonment.

Watson vs. Murray, 23 N. J. Eq. 257, cited 103 U. S. 277.

To same effect, Lemon vs. Grosskolp, 22 Wise 447.

Where profits were made by a firm of railroad contractors fraudulently dealing with themselves as directors, the transaction was held void as against public policy, and the Court refused an accounting even as to realized profits, distinguishing Brooks vs. Martin, upon the ground that the transaction in that case was not immoral.

Jackson vs. McLean, 36 Fed. Rep. 213, 217.

So it has been held in Massachusetts that a bill in equity cannot be sus-

tained by one of the parties to a contract for illegal trading with inhabitants of insurrectionary States against another party to such contract for an account of resulting profits.

Snoll vs. Dwight, 120 Mass. 9.

Dunham vs. Presly, 120 Mass. 285.

To same effect

Lane vs. Thomas, 37 Texas 157.

Glascock vs. Wells, 23 La. Ann. 517.

So, in Illinois, in 1875, in relation to a contract in restraint of trade, (similar to those monopolistic arrangements now known as "trusts") the Court refused its aid to require an account of profits, although the contract had been executed.

Craft vs. McConoughy, 79 Ill. 336.

Citing 54 Ill. 309; 58 Ill. 172.

66 Ill. 452; see also, 99 Ill. 222.

So in Indiana, in 1886, where in relation to an arrangement by which the plaintiff was induced to withhold a lower bid for a public contract on being promised a share of the profits, part of which had been realized, the Court said: "Persons who combine in schemes of the character disclosed can secure no aid from the Courts in coercing a division of the profits whether anticipated or accrued. They may rely for a division of the resulting profits upon those sentiments of honor which are supposed to prevail among all who form combinations, which are con-condemned by the policy of the law."

Hunter vs. Pfeiter, 6 West. Rep. 403.

Same principle, Read vs. Smith, 60 Tex. 375.

The idea rather quaintly expressed by the Indiana judge in the case above cited is more bluntly put by the New Court in this form: "The sentiment of honor among thieves cannot be enforced in Courts of justice."

Woodworth vs. Rennett, 43 N. Y. 277.

There can be no recovery of a balance of account arising out of illegal transactions (tonnage laws).

Cambioso vs. Maffitt, 2 Wash. C. C. 98.

So much of a bill in equity as sought an account of an illegal underwriting business was dismissed and an account decreed as to other partnership business which was legal.

Knoles vs. Haughton, 11 Ves. 168.

The same doctrine is held in Virginia.

There a Court of equity will not lend its aid for the settlement and adjustment of the transactions of a partner-ship for gambling, nor will it give relief to either partner against the other founded on transactions arising out of such partnership, whether for profits, losses, expenses, contribution or reimbursements.

Watson vs. Fletcher, 7 Grat. 1.

A parallel case in Iowa, Anderson vs. Powell, 44 Iowa 20.

Consistently with these authorities, it has been held in Maryland, in cases which have never been overruled, that neither the proceeds of an illegal voyage, after the sale of vessel and cargo, nor even the proceeds of the vessel itself, could be recovered from a consignee.

Stewart vs. McIntosh, 4 H. & J. 233.

Chappell vs. Stansbury, 4 H. & J. 560.

Many other cases to the like effect will be found collected in the recent text books, and some cases which apparently conflict with them.

Green, Pub. Pol., 104.

1 Bates Ptnp., Sec. 119-129.

1 Lind Ptnp. 106.

1 Whart. Cont., Sec. 349.

Branley Cont., 95.

All these cases on both sides have been carefully examined, and the result is found in a decided preponderance of authority in favor of the view heretofore ascribed to the Maryland decision in 34 Md., and with special distinctness announced, and acted on in the cases from N. J., one of which has been recognized by the Supreme Court of the United States. Collating all the cases on both sides with a view of extracting a common principle which shall reconcile apparent discrepancies, it will be found that the practical test to determine the Court in either giving or refusing an account to one of the parties to a part and completed illegal contract as against another, is, after all, public policy, and in the application of that test, the Court must look at the circumstances of the particular venture, and at the more or less pernicious and demoralizing effect of the example afforded by its successful prosecution. The Supreme Court, for instance, in Brooks vs. Martin, did not seem to be much impressed, if at all, by the claims to consideration of other soldiers actual or potential, than those particular soldiers of the Mexican War, whose rights had been illegally speculated upon in the particular case, nor did they seem

to consider such speculations at the expense of the soldiers as likely to have a demoralizing effect upon the general public. Hence we must conclude that the Court saw no great public interest involved, in the morale of their decision, and therefore we can understand the language already quoted, importing that there were no interests in the controversy entitled to consideration, beyond those of the immediate parties. Should the same state of facts come before another Court with different views of public policy, the decision would be otherwise. So in the South Carolina case. The learned Chancellor, as was natural at that day, was not particularly impressed with the pernicious example upon the public of a successful slave-trading operation. Hence, in the decision, we see the "length of the Chancellor's foot." Probably, in most Courts of the present day, that case would be ruled differently. The Maryland cases before cited from 4 H. & J. are squarely opposed to it. In like manner a Court, if there be such a Court anywhere which should be unable to see any great public mischief in gambling, would not be likely to coincide with 44 Iowa 20, or with the Virginia decision before cited from 7 Gratton, both of which proceed upon the public policy of stamping upon a demoralizing example with all the energy of stern judicial reprobation.

And so with respect to the case of partners who have made money by palming off upon their customers shoddy, pinchbeck and adulterated goods, or a firm of contractors who have secured a lucrative job by fraudulent collusion. Whether or not an accounting of such profits would be allowed judicially, would depend upon the view the particular Court might entertain as to the more or less demoralizing effect of the example upon the public of the success of such swindles. That such practices were common, if they are common, would not, I apprehend much influence the decision. If a Court finds itself surrounded by demoralizing tendencies it is its duty to the public to resist those tendencies, and not to succumb to them. To borrow the figure of a great judge (Gibson, C. J.) used in a different connection, *the flag must be kept flying.*

Courts better subserve the real inter-

ests of society when they permit an occasional conspirator against its laws to fall a victim in the house of his friends to his own devices, then when, in order to accommodate him, they scale down the standard of public morality.

No one at this day doubts the wisdom of the well known rule of equity forbidding acquisitions by a trustee of the trust estate. And yet through its application multitudes of transactions have been and will continue to be annulled in which the purchase by the trustee was openly made, with no reason to doubt the fairness of his conduct.

Conway vs. Green, 1 H. & J. 152.

So common indeed were the violations of this salutary principle in the time of Lord Chancellor Thurlow, that we find him hesitating at first to apply it to the facts of what is now referred to as the leading case on that subject, through fear of setting "a precedent, which shall run the hazard of undoing all the common transactions of mankind and of rendering all their dealings too insecure."

Fox vs. Mackreth, 1 L. C. Eq. 4th Eng. Ed. 138.

2 Cox 320.

When we compare the two it must be felt that as between even the wholesome rule referred to, and the principle which forbids a judicial accounting between confederates in crime, the latter stands upon broader, although perhaps not higher grounds of public policy.

The one is designed to protect from spoliation the weak and confiding members of society, while the other is calculated to protect from corruption society itself.

But in one respect they are alike. It is characteristic of both principles that they reach further and aim higher than the apparent justice of the particular litigation, and contemplate more general interests than those of the immediate parties.

At this day we are amazed and confounded at the spectacle of colossal fortunes suddenly amassed. Never in the history of mankind has the corrupting power of wealth been more audacious and aggressive.

In the face of this startling fact, and of the easy virtue of the needy adventurers who are too often found in positions of public trust peculiarly

open to temptation, it may well be pondered whether it is not time for Courts of justice everywhere to present a stern and solid front against every corrupt combination between unscrupulous contractors and perfidious officials, at every stage, from its conception to its consummation, from its unsavory blossom to the division of its ripe and gathered fruit.

If these views are correct and the division is along the line of public policy, there can be no doubt upon which side of that line the present case is to be found. Bribery and corruption, under whatever disguise they may be practiced, are the canker-worms of the body politic. There is no more insidious or formidable menace to the political institutions of the State and Union. If such practices with public officials as those evidenced by this record are to prevail, there is an end at once of all honorable competition in business. No honest man can make a living. American honor will become a reproach among moderns as Punic faith became a by-word among ancients.

If the officials of municipal corporations are to be tampered with and their influence bought by commissions upon the jobs they are induced to furnish, extravagance and peculation will be the watchword and reply. Taxation will increase until it becomes intolerably oppressive. Necessary public improvements will be stinted and the labor and supplies that they legitimately require will be unemployed. While these languish, jobs and schemes flourish, undue profits made at the public expense are divided between their projectors and the officials in their secret interest, and if only the Courts of justice can be got to wink at the specious name of "commissions," and then to recognize the principle that "nothing succeeds like success" by consenting to act as arbiters in the division of the proceeds of "accomplished facts," the triumph of profligacy is complete. Unchecked by stern judicial outlawry, at any and every stage, the evil will spread until society is honey-combed as by dry rot, and the end is reached in municipal bankruptcy.

"Thus bad begins: but worse remains behind."

Clandestine and illicit understandings, at the public expense, between contractors and officials, trustees for the public, are not only grossly corrupt in themselves, but they are the prolific breeders of future wickedness. Experience shows that the parties to such intrigues are as a general rule prepared to perjure themselves rather than give away an accomplice or themselves. Partially demoralized before they come together, after the conspirators have struck hands, the mutual consciousness of guilt and the fear of discovery complete the demoralization. Where you find bribery there you may be sure to find perjury in the egg.

In order to steer clear of obstacles and arrive safely at its destination, it is just as necessary for bribery to be closely attended by perjury, as it is for the driving wheel of a bicycle to be followed by its guide wheel.

Such is the evil example and such are the pernicious tendencies of these practices, and Courts have to deal with examples and tendencies. Beyond all question they are in themselves contra bonos mores, and pock marked with turpitude. And that the last vestige of doubt may vanish as to such transactions being conspicuously contrary to public policy, they are by law declared offences punishable wherever committed within the jurisdiction of the State by fine and the penitentiary, and in addition branded with the infamy of disfranchisement and disability by the organic act of the people at large.

Tool Co. vs. Norris, 2 Wall. 45.

Trist vs. Child, 21 Wall. 441.

Maguire vs. Corwin, 101 U. S. 111.

Oscanyan vs. Arms Co., 103 U. S. 261.

In the absence of proof as to the laws of the several States in which these objectional contracts were made, the Court must, in considering their character be governed by the law of Maryland.

1 H. & J. 720, 3 G. & J. 242, 7 Gill 395. 25 Md. 419-20.

But even if it was a supposable case that under the laws of these States the contracts were legitimate, the Courts of this State will contemplate their effect, when brought into controversy here, from the standpoint of our own laws, our own morality and our own policy.

Oscanyan vs. Arms Co., 103 U. S. 277. Citing Watson vs. Murray, 23 N. J. Eq. 257.

Pointedly applicable here are the following sententious utterances: "The

general rule to which we have referred (in pari delicto, &c.) is most salutary and conservative, as a means suppressing illegal and fraudulent contracts and nothing should be done by the Courts to weaken its force and operation. The suppression of such transactions is far more likely in general, to be accomplished by leaving the parties without remedy against each other, and thus introducing a preventive check, than by enforcing them at the instance of one of the parties to the fraud; and nowhere has this doctrine been more unqualifiedly adopted than in this State. Public morals, public justice and the well established principles of judicial tribunals, alike forbid the interposition of the Court to aid in the enforcement of a transaction like the present. The law leaves the parties to such transactions as it found them; and if either has sustained loss by bad faith of a *particeps criminis*, it is but a just infliction."

Alvey, C. J., in Roman vs. Mali, 42 Md. 533.

I am, therefore, clearly of opinion that the doctrine announced by the Supreme Court in 2 Wall. 70, does not apply to scandalous and criminal transactions like those disclosed. The distinguishing test suggested by the Court of Appeals, 34 Md. 344, adopted by the New Jersey cases and endeavored to be applied here, seems more reasonable and satisfactory than those resorted to by some other State Courts in their efforts to find some loop hole to escape from the evidently unpalatable doctrine of Brooks vs. Martin.

King vs. Winants, 71 N. C. 469.

Snell vs. Dwight, 120 Mass. 9.

Gould vs. Kendall, 15 Neb. 549, 555.

It must, however, in this connection, be especially noticed that the same distinctions made in the cases last cited may with equal propriety be drawn here. There has been no settlement, so far as these parties are concerned, of their illegal transactions. The Court cannot shut its eyes to them, and is obliged to handle them to a greater or less extent in determining many disputed items among these "commissions," and otherwise. Neither has there been any distinct, subsequent, specific fraud, perpetrated by one of the confederate parties upon the other and set forth in the bill as a substantive ground for equitable relief, such as especially characterized the prin-

cipal case referred to and forms a prominent topic in the opinion of the Supreme Court, 2 Wall. 82. It is true that in the contest over the auditor's account, the plaintiff sur-charges and falsifies both in detail and in gross and in general charges a studied design to cheat. But all these matters are merely incidental to the account itself; to investigate them properly requires a thorough overhauling of all their transactions, lawful and unlawful. And to repeat, there is nothing here like a distinct, subsequent and substantive ground of equitable relief charged in the bill, and interposed as a screen (as it were) to intercept and hide the original illegal transactions.

It will be observed that no attempt has been made here to challenge the authority of Brooks vs. Martin within its proper lines. This is a State Court of first instance and subordinate jurisdiction. That is the decision of a majority of the Supreme Court of the United States, and it has received in the qualified manner already explained the sanction of the Court of Appeals of Maryland. It was pronounced by Mr. Justice Miller, *clarum et venerabile nomen*, a profound and accomplished jurist, whose masterly judgments have for many years been the pride of the American bar and bench.

It was dissented from by Mr. Justice Catron in few but vigorous words upon the ground that "the partnership having been formed for the purpose of speculating in soldiers' claims to warrants, the original transaction was a fraud upon the Act of Congress, violating public policy and that in such a case equity does not interfere." 2 Wall. 87.

The majority opinion was mainly based upon a decision by Lord Chancellor Cottenham in Sharp vs. Taylor. 2 Ph. Ch. 801. Since the case in Wallace, the English decision on which it was founded has passed under the searching review of Sir George Jessel. The reasoning of Lord Cottenham that the illegal transaction being completed will not be in any manner affected by what the Court is asked to do, as between the parties, that great master of modern equity pronounces to be "inconclusive and unsatisfactory." "The notion," continues Sir George Jessel, "that because a transaction which is illegal is closed, that therefore a Court of equity is to interfere in dividing the

proceeds of the illegal transaction, is not only opposed to principle but to authority." He then goes on to illustrate by the case of highwaymen (already referred to) by a case of smuggling, and a case of gambling, and adds: "It is no part of the duty of a Court of justice to aid either in carrying out an illegal contract or in dividing the proceeds arising from an illegal contract between the parties to that illegal contract. In my opinion no action can be maintained for the one purpose more than for the other."

Sykes vs. Beadon, 11 Ch. D. 170, 195-7.

The judgment of the master of the Rolls was predicated upon the supposed illegality of an association because of its non-compliance with the terms of an Act of Parliament; upon the question of construction and application of this particular statute, Sykes vs. Beadon was afterward overruled in Smith vs. Anderson, 15 Ch. D. 247.

Subsequently to and notwithstanding the last cited case, the opinion of Sir George Jessel, as above stated, has received the unqualified approval of the highest authority in this particular department of jurisprudence at this day in England.

1 Lind. Ptnp. 102 note.

It is also cited in 1 Pom. Eq. Jur., Section 402, note.

1 Bates Ptnp., Sec. 125.

See the criticism on Brooks vs. Martin in Wald's Pollock 332, and Todd vs. Rafferty, 30 N. J. Eq. 269 (40 p.) and the observations in Bates Ptnp., Sec. 124, &c.

Snell vs. Dwight, 120 Mass. 15, 19.

Gould vs. Kendall, 15 Neb. 555.

King vs. Winants, 71 N. C. 469.

It would perhaps not be deemed becoming nor yet called for by the necessities of the present case for this Court to volunteer· its own opinion on the real merits of the important controversy still going on over the doctrine of Sharp vs. Taylor and Brooks vs. Martin, and with these references the observations on that topic will close.

It only remains that under this head to concentrate the results gathered from authority in the light of principle, premising that what is said to the "plaintiff" equally applies to the defendants, both parties being actors, both confident and both pressing.

It is a maxim of equity that he who seeks its relief "must come with clean hands." As to the proceeds of the sales in question, the plaintiff's hands are not clean.

It is a maxim of jurisprudence, that "no man shall take advantage of his own wrong." As to the proceeds of the sales in question, the attitude of the plaintiff is within the scope of that maxim.

"*Ex turpi causa non oritur actio.*"

The fountain source of the plaintiff's claim is corrupt so far as it relates to the proceeds of the sales in question. *In Pari delicto potior est conditio defendentis.*

Public policy forbids the judicial partition among accomplices of the proceeds of sales made by corrupting public officials. Its aim is three-fold. Primarily, to discourage similar enterprises and to make the way· of the transgressor hard and dangerous, by depriving him of the protection of the law he has violated, and by leaving him at the mercy of the confederate he has chosen. Secondly, to vindicate the majesty of the law by sternly branding its violators instead of placing them on a level with the innocent, and either condoning guilt or else deprecating it ·in compromising and apologetic terms. *Judex damnatur cum nocens absolvitur.*

And lastly, to keep the administration of justice respectable by elevating it above the too familiar approach of scandals and crimes, seeking to make Courts administer the code of "honor among thieves."

Both upon principle and authority, the second inquiry propounded at the outset of this investigation must, as well as the first, be answered in the negative. The plaintiff is not entitled to an account of any profits derived from inculpated transactions.

Is he entitled to an account of the legitimate transactions? He certainly is unless they are so blended and confused with those which are illegitimate that no proper accounting can be had.

Trist vs. Child, 21 Wall. 441, 452.

Watson vs. Fletcher, 7 Grat. 1.

Anderson vs. Powell, 44 Iowa 20.

Lane vs. Thomas, 37 Texas 157.

Knowles vs. Haughton, 11 Ves. 168.

This is a practical question, the answer to which need not be looked for in the books.

It is rather a matter for an accountant than for a Court. It is certain that none of the accounts in evidence

were kept with reference to any such principle of adjustment, and that no such idea was had in view in the presentation of any of the testimony.

Having carefully analyzed the auditor's account A, which is relied on by the defendants, and the account B prepared under the plaintiffs' instructions, with all the light thrown on them by the accompanying abstracts and vouchers, they certainly appear both of them in the present state of the record, incapable of apportionment, as to the largest debit items, in such wise as to ascertain the net profits resulting exclusively from legitimate sales. And yet such apportionment must absolutely be had, before any further progress can be made with the case. All legitimate sales, and all the net profit attributable to them must be wholly eliminated, if practicable, and if impracticable there is simply an end of the case. If the accounts are susceptible of this sifting and winnowing, it is plain that an entirely new face will be put upon the controversy, and that many questions that have been brought in issue will disappear, or change their aspect. Matters like the Spillman business will be heard of no more. In fact it is sufficiently obvious that to attempt a decision of the case as presented in argument, ignoring altogether the presence of the obnoxious element which is found to vitiate every result, would be to begin at the wrong end. By remanding the case for further inquiry, with a reasonable opportunity to both parties to produce evidence specially directed and confined to the ascertainment of the net profit arising exclusively from lawful transactions, the result will be either a report from the auditor to the effect that no proper accounting can be made, or alternative accounts framed upon the basis indicated, presenting the conflicting theories of the respective parties, purged from the impurities which now condemn them both. Until such a proper accounting is reached there is nothing more before the Court which legitimately calls for decision.

An order to that effect will be signed on application of either side.

If no such application be made within twenty days, the interlocutory decree will be discharged, and the bill and cross-bills dismissed, each side to pay their own costs.