EPAMINONDAS WILSON (for the benefit of THOMAS W. EVANS) *vs.* HANNAH C. JACKSON, administratrix, & others.

Suffolk. November 30, 1909. — January 11, 1910.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Insolvency. Equity Jurisdiction,* For an accounting, To revise decree of Court of Insolvency. *Court of Insolvency,* Jurisdiction, Supervisory bill. *Equity Pleading and Practice,* Master's report. *Fraud.*

The duty of accounting owed by an assignee of the estate of one adjudicated an insolvent under our State insolvency laws is subject to the exclusive jurisdiction of the Court of Insolvency in which the insolvency proceedings were begun, and a court of equity has no jurisdiction to compel such an accounting.

Where a suit in equity under R. L. c. 163, § 17, to revise certain decrees of the Court of Insolvency, is referred to a master under a rule which directs him "to find the facts," and the master in his report states a ruling by him as to the decree which the Court of Insolvency should have entered, the ruling thus stated may be disregarded, the making of it not being within the duties imposed upon the master by the order of reference.

Where a suit in equity under R. L. c. 163, § 17, to revise certain decrees of the Court of Insolvency, is referred to a master, and among the evidence and records before the master is a decree made by a single justice of this court upon an appeal from a decree of the Court of Insolvency, if it appears that no appeal to the full court was taken from such decree of the single justice, and that no leave ever was given by the full court under R. L. c. 159, § 28, to reopen such decree, that decree is final as to all matters covered by it, and findings of

fact made by the master and contained in his report upon matters settled by that decree may be disregarded.

In a suit in equity under R. L. c. 163, § 17, to revise certain decrees of the Court of Insolvency, the plaintiff stood in the place of an insolvent, who upon his petition in insolvency, filed sixteen years before, had been adjudicated an insolvent and had offered to his creditors a compromise of twenty per cent, after the acceptance of which about six months later he had received his discharge. It appeared that the insolvent had entered into a corrupt agreement with his attorney and a man who was to be appointed one of his assignees in insolvency, to cheat the insolvent's creditors to the amount of over $28,000 by inducing them to accept a compromise by which they would receive less than they were entitled to, and to divide the money thus fraudulently retained equally among the three, that by reason of this fraudulent agreement the compromise was accepted by a majority of the creditors and was confirmed by the Court of Insolvency, but that the attorney of the insolvent and the conspiring assignee in insolvency failed to carry out their agreement with the insolvent and divided between themselves the proceeds of the assets unlawfully retained from the creditors. The plaintiff sought to have the representatives of the assignees in insolvency ordered to account to him for the funds wrongfully in their hands, contending that under R. L. c. 163, § 159, upon the granting of the discharge, all property other than that which was necessary for the composition reverted to and revested in the insolvent, that the time had expired for annulling the discharge and that the confirmation of the composition had not been set aside. *Held*, that, without resorting to the ground that the words of the statute authorizing the ordering of a reconveyance to the insolvent are permissive only, or to the ground that the statute ought to be construed to apply only to property of the insolvent remaining honestly in the hands of the assignees, an accounting must be denied to the plaintiff, who had only the rights of the insolvent, on the ground that the court will refuse its aid to a party to a fraud to help him to secure his share or the whole of a fund created by that fraud.

Where in a suit in equity a report of a master is founded on evidence wholly documentary and he states in the report that no witnesses appeared before him, and this court when the master's report comes before them have also before them the same documentary evidence that was before the master, the rule that a finding of fact made by the person or tribunal having authority to pass upon it should not be disturbed unless plainly wrong has no application, this court in relation to the facts standing where the master stood.

BILL IN EQUITY, filed in the Supreme Judicial Court on October 7 and amended on December 24, 1907, under R. L. c. 163, § 17, to revise certain decrees of the Court of Insolvency for the county of Suffolk dated May 15 and 17 and September 24, 1907.

On February 12, 1909, the case came on to be heard at its final stage before *Sheldon*, J., who reserved it for determination by the full court upon the pleadings, a master's report and his supplemental report, including the evidence and exhibits reported by the master, and the exceptions thereto of the respondent

Jackson, the administratrix of the will of Coburn mentioned below, such decree to be entered as equity and justice might require.

The following statement of the case is taken from the opinion of the court :

One Epaminondas Wilson filed his petition in insolvency on October 21, 1891, and thereafter was adjudicated an insolvent. On March 11, 1892, he offered a compromise of twenty per cent. That compromise was confirmed on April 1, 1892, and Wilson received his discharge on April 12 of the same year.

On May 16, 1894, he filed a petition in the Court of Insolvency alleging these facts and alleging in addition that the assignees (Coburn and Pratt by name) had in their hands property to the amount of $30,000 after the payment of all sums due to his creditors ; that they refused to pay this over to him or to file an account of their doings as the assignees of his estate. This petition was amended in January, 1895.

The assignee Coburn had died in the interim between the filing of this petition and of this amendment. The amendment contained a prayer that the administratrix of his estate might be cited in in his place. By a decree of the Court of Insolvency made on January 28, 1895, the surviving assignee Pratt was directed to file an account on or before March 1, 1895. Thereupon he filed a supervisory bill in the Supreme Judicial Court under what is now R. L. c. 163, § 17, in which he set up that the parties had settled among themselves all claims growing out of the insolvency.

The supervisory suit was heard by a single justice of this court and seems to have been decided on March 27, 1895. No formal decree was made, but there was a docket entry, " Bill dismissed with costs," the date of which does not appear on this record.

On April 29, 1895, Pratt, the surviving assignee, filed an account. Hearings on the allowance of that account seem to have begun on October 2, 1895, and to have continued until March 2, 1898. On October 13, 1896, Pratt died and the defense was carried on by the administrator of his estate.

On June 15, 1900, the judge of insolvency entered a decree as the result of these hearings. In that decree the judge found

two facts, to wit: (1) That the insolvent became satisfied that he could not procure the necessary assent of a majority in value of his creditors to the compromise offered by him unless he obtained the assent of the Boylston Bank. Thereupon, "colluding" with Pratt, one of the assignees, the insolvent authorized him [Pratt] "to pay said bank sixty cents on the dollar being forty cents on the dollar more than any other creditor would receive," and that this was done. (2) That an agreement was made between the insolvent, his attorney and Pratt, by which the residue of the estate left after paying the creditors should be divided equally between them. That a quarrel arose in carrying this agreement into effect; that the insolvent, thinking that he had not received his share under that agreement, brought the petition of May 16, 1894 (on which the hearings had taken place), to have the assignees file an account. The decree ends with these words: "Upon a hearing being had upon said account the above facts appeared in evidence. Whereupon the court finds that said discharge was void under the provisions of section 93 of chapter 157 of the Public Statutes, and that said discharge was obtained by a fraud upon the court, and a fraud upon the creditors; and the court therefore declined to make any decision upon said account or upon said petition in equity which shall vest any rights either in said insolvent or said assignees."

On July 2, 1900, the insolvent filed a supervisory bill in the Supreme Judicial Court, dated June 16, 1900, to have this decree reversed. This supervisory suit was referred to a master,* who made a report on October 20, 1906. Exceptions were taken by the insolvent to this report. These are not set forth in the record, but the master's report is.

This report of the master confirmed the two findings of fact (stated above) made by the Court of Insolvency. The master in his report stated somewhat in detail the making of the agreement to divide what was left of the insolvent's estate after the compromise of twenty per cent had been paid to creditors, and the transactions which gave rise to the insolvent's thinking that he had not received his share of that surplus. He also stated

---

* Francis W. Hurd, Esquire.

shortly the transaction by which sixty in place of twenty per cent was paid to the Boylston Bank. In addition he found that on April 29, 1892 (seventeen days after the insolvent's discharge was granted to him), $1,968.24 had been paid by a common law assignee to Coburn who paid it to Pratt, and Pratt divided it between himself and the plaintiff's attorney. The master reported to the court the question whether on these facts the decree of the Court of Insolvency should be annulled or modified. His report ended with these words: " The petitioner offered evidence upon items of the assignees' account, and claimed that an assignees' account should be stated and reported by the master; this was objected to and I ruled that upon the present status of the cause, such evidence and report would be premature."

The case came on for hearing before a single justice of this court * upon the master's report and the exceptions thereto; and on November 24, 1906, a decree was entered by the single justice. By this decree all the exceptions were overruled and the report was confirmed; the last clause of the decree of the Court of Insolvency was stricken out and in place of it the administrator of Pratt's estate was directed to file an account of all the doings of the assignees and of all his doings as surviving assignee; and the administratrix of Coburn's estate was directed to file an account of all money, property and assets " which have come into her hands as administratrix," and which were part of the insolvent's estate in the hands of Coburn as one of the assignees. The decree then provided: " That the recital of facts and the findings of the court, contained in said decree, are not to be altered "; that neither party should be allowed costs " in this court," and " that a copy of this decree be certified to the said Court of Insolvency for its direction."

The facts (as to the agreement to divide the surplus of the insolvent's estate after paying the compromise of twenty per cent) stated in the master's report (on which the decree of the single justice was founded providing that " the findings of the court [of insolvency], contained in said decree, are not to be altered ") were these: One Carpenter was the legal adviser of

---

* *Sheldon*, J.

the insolvent from August 25, 1891, to October 11, 1892. The insolvent had made a common law assignment in May, 1891. In August or September Carpenter advised the insolvent to go into insolvency, to make a composition with his creditors, and "that what was left of the estate after such settlement should be divided between" him (Carpenter) and the insolvent. After the petition in insolvency was filed on October 21, 1891, Carpenter became attorney for a large number of creditors whom he represented in the choice of assignees. Early in November, 1891, a few days before the assignees of the insolvent were appointed, Pratt was introduced to Carpenter by the insolvent, and it was then orally agreed between Carpenter, Pratt and the insolvent that Pratt should be made one of the assignees, and that "after a composition settlement the property that was left should be divided equally between" the three, Carpenter (the insolvent's attorney), Pratt (who was to be elected an assignee), and the insolvent. Pratt, together with Coburn, was elected an assignee. Some three or four weeks before the insolvent received his discharge (he received his discharge on April 12, 1892, as stated above), Carpenter drew up a written agreement by which (in consideration of Pratt, Coburn and Carpenter's effecting a compromise with his creditors on the offer of a composition "now pending," and securing the assent of his creditors to his discharge) the insolvent agreed "to accept for my proportion a one-fourth interest in all the residue of my said estate both real and personal, after said composition is paid to my said creditors, except the right of dower which is now held by my wife Sarah E. Wilson, and I further agree to accept the equity in my said real estate, according to the assessed valuation, to wit: Fifty-eight Hundred ($5800) Dollars, as part payment of my share." Coburn refused to sign the paper. It was then orally agreed to divide into thirds in place of fourths. On the day the insolvent obtained his discharge, but after he had obtained it, the insolvent signed and sealed the agreement stated above. Pratt and Carpenter then signed and sealed the following agreement: " We, the undersigned, hereby agree, that in case said Wilson's share in the residue of his estate, after the payment of his said composition in insolvency, does not amount to the sum of Fifty-eight Hundred ($5800) Dollars, he shall

receive the equity in his said real estate this day conveyed to Isaac L. Pratt, as his proportion of the whole sum remaining, without regard to our share."

On May 24, 1892, an agreement was made for the sale of the personal property of the insolvent consisting of pianos, machinery, etc., and spoken of as the "piano plant," to James B. Taylor and others of Wooster, Ohio, for $15,000. The "piano plant" was soon after moved to that place. A further agreement was made on May 24 between Wilson and Taylor and others, reciting that Taylor and others had bought "the plant of the Boston Piano Company of which the insolvent was the real owner," and providing that it should be removed to Wooster, Ohio, where a company was to be organized with a capital of $30,000, sixteen thirtieths of which were to go to Wilson and fourteen thirtieths to Taylor and others. Wilson expected to receive under this agreement $16,000 paid up stock; but Taylor and others, in the summer and autumn of 1892, took the position that he was to have assigned to him the opportunity to subscribe and pay for $16,000 of capital stock. Pratt and Carpenter received the $15,000 and divided it between them, and the insolvent got nothing. The real estate which was to go to the insolvent under the agreement stated above was conveyed to his wife.

The whole story of the quarrel which arose out of the division between Carpenter, Pratt and the insolvent was not given in this master's report but it appeared in the evidence put in at the hearing before the single justice of this court * in 1895, and in the hearings before the judge of the Court of Insolvency in 1895 and 1898, which evidence and all of it was submitted to the master and was before the full court in the present proceeding. From that evidence it appeared that $10,000 of the $15,000 was paid within two weeks of the purchase (that is, in the early part of June, 1892), and that notes were given for the remaining $5,000 which was paid about October 1, 1892. On October 11, 1892, Carpenter, Pratt and the insolvent came together for a final settlement. The insolvent, by an instrument under seal, dated on that day, assigned and transferred to Pratt and Carpenter all sums of money and choses in action "now due and

---

* *Knowlton, J.*

coming to me from my estate by virtue of my discharge in insolvency dated April 12, 1892, except such sum as I received from the sale of the piano plant to parties in Wooster, Ohio, as my share taken in stock." Apparently on the same day the deeds were delivered to the insolvent of his real estate. This real estate was the land and house where he lived and had been conveyed on April 12, 1892, to Pratt for the purpose of keeping it from attachment by foreign creditors. Eleven days later the insolvent wrote to Carpenter, saying that he was "not satisfied" with the settlement of his affairs, and "if I have signed any papers under your advice, against my own interests," they should be destroyed, Pratt and Carpenter should be paid for services, and the proceeds of the estate turned over to him (the insolvent). The contention of Pratt and of the administrator of his estate, and later the contention of the administratrix of Coburn's estate has been that this change of front on the part of the insolvent came from the position taken by the persons in Wooster who bought the "piano plant," which, if upheld, rendered the insolvent's rights as to sixteen thirtieths of the stock in the new company worthless to him. By the supplementary agreement of May 24, 1892, the insolvent was to have the conduct of the business of the new corporation in Wooster.

In regard to the transaction by which a dividend of sixty per cent was paid to the Boylston Bank, it was found in the master's report that this fraud was suggested to the insolvent and Pratt by the counsel for the bank, and that it was made and carried out at the request of the insolvent. Coburn was a director of the bank, and (although it was not so found in terms by the master) he was a party to this fraud. The extra forty per cent was paid to the bank through an assignee of its claim by a joint check of the two assignees, drawn on April 25, 1892.

The result of the decree of November 24, 1906, entered upon the report of the master was to confirm the two findings made by the Court of Insolvency to the effect that the insolvent had committed two frauds upon that court, and to remand the case to that court to settle with Pratt's administratrix the account of the assignees and the survivor of them ; and to settle with Coburn's administratrix what property, if any, belonging to the

insolvent estate had come into her hands. On February 4, 1907, Coburn's administratrix filed an account stating that nothing had come into her hands which was part of the insolvent's estate.

Thereafter hearings were had in the Court of Insolvency, and on May 15, 1907, a decree was made by that court. That decree is in these words: "The first and final account of Hannah C. Jackson, as administratrix of the estate of Frank J. Coburn one of the assignees of the estate of Epaminondas Wilson, and the foregoing account [being the account filed by Pratt on April 29, 1895] having been presented for allowance, and the same having been verified by the oath of the accountants, and objection being made thereto ; said accounts have been fully heard, examined and considered by the court. It is decreed that I. Lowell Pratt and Frank J. Coburn as assignees in insolvency of estate of Epaminondas Wilson be charged with the sum of $1968.24 the amounts received by them from the common law assignees. That the following payments be disallowed ; $200 for the alleged services of appraisers; $5359.22 being the sum illegally and fraudulently paid on the claim of the Boylston National Bank; $37000 paid to I. Lowell Pratt, assignee, for services; and $1500 paid Frank J. Coburn, assignee, for services. And it is further ordered and decreed that there is a balance due from said Pratt and Coburn as assignees as aforesaid of the sum of $12,715.08, and said accounts as thus amended are allowed."

On October 7, 1907, the insolvent filed the present supervisory bill to revise this decree and two other decrees of the. insolvency court, to wit: One appointing an assignee of the insolvent's estate and the other giving that assignee the conduct of the petition filed by the insolvent in January, 1895, amending his petition of May 16, 1894, to compel the assignees to account.

The defendants named in this supervisory bill were the administratrix of Coburn's estate, the administrator of Pratt's estate and the newly appointed assignee of the insolvent's estate. The prayers of this petition were (1) that the finding that the amount due from Pratt and Coburn, assignees, was $12,715.08 might be set aside as less than the amount due, and that a just finding might be made in its stead ; (2) that the insolvent and not the new assignee was entitled to whatever sums

might be found to be due from the assignees; and (3) "that there may be a hearing upon all the evidence as to the liability of said Pratt and Coburn as assignees, and their legal representatives, and that said decrees of the Court of Insolvency may be revised in accordance with the decree of this court."

On December 24, 1907, one Evans, to whom the insolvent in April, 1896, had assigned all claims he had against Pratt and Coburn, was allowed to amend the supervisory bill by setting forth the assignment. On March 18, 1908, the petition was taken *pro confesso* against Pratt's administrator. Coburn's administratrix and Ensign filed answers, and on April 7, 1908, the cause was referred to a master * " to hear the parties and their evidence, and to find the facts, and report the same to the court."

On June 15, 1908, the master made a report. On June 26, 1908, a motion to recommit was made and on September 22, 1908, the cause was recommitted to the master. On December 21, 1908, the master filed a supplemental report. On December 23 it was again recommitted to him, and on January 9, 1909, he made a second supplemental report. Various exceptions to the master's reports were taken by Coburn's administratrix. On February 5, 1909, Evans having died, the administrator of his estate was admitted as a party in his stead.

On February 12, 1909, the case was reserved upon the pleadings, the master's report and supplemental report, including the evidence and exhibits reported by the master and the exceptions taken thereto by Coburn's administratrix.

The master in his report found that the amount due from the assignees was $31,699.87, to which he added interest to June 5, 1908, making a total of $61,732.31. He found in substance that Carpenter and Pratt had devised a fraudulent scheme to cheat the insolvent, and that the consent of Coburn to it had been bought by their paying to the Boylston Bank of which he was a director, sixty in place of twenty per cent; that in consequence he was liable for all sums taken by Carpenter and Pratt.

At the request of the assignee of the insolvent's claim the master ruled: " That the Court of Insolvency should have

* Charles E. Grinnell, Esquire.

ordered and decreed the payments to Wilson, the plaintiff, by the defendants Lowell Tyler Pratt, as administrator of the estate of Isaac Lowell Pratt, and Hannah C. Jackson, as administratrix of the estate of Frank J. Coburn, of all sums disallowed from the account filed by said Isaac Lowell Pratt as surviving assignee and of all sums with which said assignees are chargeable, and interest on said sums, and that execution issue therefor." The master's report ended with this finding: " And that whether or not any part of the said decrees of the Court of Insolvency stands, or should stand, the contents of the said decrees are details which, upon all the evidence heard by me, are controlled by such evidence, so that the said Wilson is not *in pari delicto* with his said assignees or either of them; and that the said agreements of Wilson with Pratt, Carpenter, Coburn, or any of them, are, because of their said frauds, not binding on Wilson."

*R. M. Morse,* for E. W. Brewer, administrator of the estate of Thomas W. Evans, assignee of Wilson's claim.

*E. A. Whitman,* for the defendant Jackson.

*C. S. Ensign,* Jr., assignee, filed a brief by leave of court.

LORING, J. [After the foregoing statement of the case.] Some confusion has been brought into the case by the original solicitor of the petitioner in insolvency because of his treating the amendment in January, 1895, to the petition in the Court of Insolvency as an amendment which made the original petition a bill in equity. We agree with the learned counsel who appeared before us in support of the present bill that the amendment of January, 1895, did not convert the petition into a bill in equity. The duty of accounting owed by assignees of the estate of one adjudicated an insolvent under the State insolvency laws is a duty within the exclusive jurisdiction of the Court of Insolvency in which the insolvency proceedings were begun. A court of equity would have had no jurisdiction of such a bill. If the petition of May 16, 1894, was made into a bill in equity by the petitioner's amendment of January, 1895, the petitioner by that amendment put himself out of court. The petition originally was and after the amendment must be taken to have remained a petition in the insolvency court to require the assignees to file an account of their doings as assignees.

The rule under which the present supervisory suit was sent to

the master directed him "to find the facts." His ruling as to the decree which the Court of Insolvency should have entered was not within the scope of the duties imposed upon him by the order of reference, and may be disregarded.

No appeal to the full court was taken from the decree of the single justice of this court, made on November 24, 1906, and no leave ever has been given by the full court under R. L. c. 159, § 28, to reopen that decree by filing a late appeal. That decree therefore is final on all matters covered by it. By that decree the fact was established that the insolvent had been a party to two frauds upon the Court of Insolvency. The only matter of fact left open was the settlement of the assignees' account. The decree in effect directed that the account should be settled first and that the question whether the insolvent was precluded from recovering by reason of these frauds should be decided after the account had been settled.

The finding of the master that the insolvent was not *in pari delicto* is a finding on a fact which, having been settled by the decree of November 24, 1906, was not open for trial, and his findings on that issue may be disregarded.

The Court of Insolvency in its decree of May 15, 1907, did not follow in one respect the direction contained in the decree of the single justice dated November 24, 1906. The direction was that the administrator of Pratt's estate should file an account of the doings of the assignees and of the survivor, and that the administratrix of Coburn's estate should file an account of the property which came into her hands belonging to the insolvent estate. In the decree of the Court of Insolvency made on May 15, 1907, both assignees are charged with the $12,715.08.

But the decree stopped short with the allowance of the account so amended, and no order was added for the payment of this sum to the insolvent, which, but for the finding of the insolvent's frauds, should have followed as matter of course the allowance of that account.

This question remains to be decided, to wit: Is the insolvent precluded from calling his assignees to account by having been a party to these two frauds or either of them?

The single justice who made the decree of November 24, 1906, doubtless thought that a true account might throw some

light on the question of fraud, and for that reason postponed the decision of that question until the account had been settled. The account confirms the result which follows from the facts found by the decree of November 24, 1906, and we shall take up that question as it was left by that decree.

It appears from the master's report on which the decree of November 24, 1906, was founded, that three or four weeks before April 12, 1892 (that is to say, before the confirmation of the compromise and the granting of the discharge), Carpenter put the agreement to divide (which theretofore had been made by word of mouth) into writing. By the written agreement four persons were to share in the residue of the estate after paying the compromise of twenty per cent, and sixty per cent (in place of twenty per cent) to the bank. But Coburn refused to become a party to this arrangement and it was signed by the three, it being orally agreed that the division should be into thirds in place of fourths. By the written agreement the insolvent agreed to take " as part payment of his share " the equity in his real estate at the assessed valuation of $5,800, and Pratt and Carpenter agreed that he should have that as his share in any event. It also appears from the master's report that the amount of the illegal payment to the bank was $5,359.22. That was not paid until April 25, 1892, but the amount to be paid was known on April 12, when the written agreement was made. The trade for this sixty per cent payment was found to have been made before April 1. From these facts the conclusion is irresistible that the insolvent knew before the confirmation of the twenty per cent compromise that he was cheating his creditors to an amount which they expected would reach the sum of four times $5,800 plus $5,359.22, or more than $28,500.

We have gone into the question of the expected amount by which the insolvent knew that he was cheating his creditors because the only possible ground on which (in our opinion) this fraud upon his creditors and upon the court could be thought not to prevent his calling his assignees to account was that it was an amount which he might reasonably have thought would be due to his assignees and his attorney and which they offered to share with him. But the amount of the cheat disposes of such a contention.

The question which we have to decide therefore is this : If an agreement is made between an insolvent, his attorney, and a man who to carry out the fraud is to be and is made one of his assignees, to cheat the insolvent's creditors to the amount of some $28,000 to $29,000 by offering to them a compromise less than their due by that amount, and to divide this sum of money equally among the three, what are the rights of the insolvent if he can prove that the agreement to divide equally was not carried out and that he did not get his share?

Counsel have at no time attempted to ask the court to give to the insolvent what is at the bottom of this complaint, namely, his equal share of the plunder. If that had been asked it would have been too apparent that one of the three was asking the court to force the other two to pay to him his share of a fund created by fraud. That difficulty is not avoided by the course which was adopted by the insolvent, namely, to ask for an accounting. The money which the insolvent asked the court to make his assignees account for was the sum out of which he had cheated his creditors by the aid of his attorney and one of the assignees. The position of the insolvent is not improved by asking that the whole sum out of which he had cheated his creditors should be paid over to him in place of the one third share of it to which as part of the fraudulent agreement which created the fund he agreed to limit himself in order that the other two might help him in the fraud which created the fund.

The main contention put forward by the learned counsel for the administrator of the assignee of the insolvent's claim against the assignees is that, in case of a composition, upon the granting of the discharge all property other than that which was necessary for the composition (in the words of the statute, R. L. c. 163, § 159) " shall revert to and revest in him [the debtor] ; and the court may order any necessary or proper release or reconveyance thereof by an assignee or trustee to whom the same may have been assigned or conveyed " ; that the insolvent's petition of January 21, 1895, for an account seeks the enforcement of the right secured to him by this statutory provision ; that this right is not dependent on the conduct of the debtor and it is not necessary therefore to consider whether the insolvent was free from blame or was in pari delicto. Also that this petition was

made after the time provided for in R. L. c. 163, § 109, had expired for applying to annul the discharge; that the composition has been confirmed and consequently nothing can be done with the sum of $12,715.08, found by the Court of Insolvency, or with the sum of $61,732.31 found by the master, but to pay it to the insolvent. The position taken is in effect this: Although the sum which the insolvent asks the court to compel the assignees to pay to him is the sum the insolvent cheated his creditors out of, yet since the time has expired for annulling his discharge and the confirmation of the composition has not been set aside, the statute revesting the property in the insolvent forces the court to direct the assignees to hand over the money to the insolvent. We do not assent to that proposition. In refusing to assent to it we do not have to rely on the fact that the words of the statute are " the court may order " a reconveyance, nor on the ground that this statute ought to be construed to apply only where there is honestly property of the debtor remaining in the hands of the assignees. The ground on which in our opinion the insolvent (and therefore the administrator of the estate of the insolvent's assignee) is not entitled to have the court direct the payment over of this sum of money is that a court will refuse to act when its aid is sought by one who is a party to a fraud to secure his share or the whole of a fund created by that fraud.

The further contention has been made in behalf of the assignees of the insolvent that the case comes within *Gargano* v. *Pope*, 184 Mass. 571. In that case the plaintiff had a valid claim against two of the defendants. She made a champertous agreement with two attorneys (the other two defendants) by which she agreed to give to them for their services sixty-six and two thirds per cent of the sum recovered by her, and that they should have a lien on that sum for payment thereof. After the two defendants had agreed to pay $550 in settlement of the valid claim of the plaintiff, she brought a bill in equity to have the contract with the attorneys set aside and to have the sum agreed upon in settlement paid to her. It was held that she was not *in pari delicto*. In the case at bar there was no honest fund as there was in *Gargano* v. *Pope*, which but for the agreement belonged wholly to the plaintiff. That is enough to distinguish

that case. But as to *Gargano* v. *Pope* see also *Downey* v. *Charles S. Gove Co.* 201 Mass. 251. The case at bar comes within the doctrine of cases like *Snell* v. *Dwight*, 120 Mass. 9 ; *Dunham* v. *Presby*, 120 Mass. 285 ; *Downey* v. *Charles S. Gove Co.* 201 Mass. 251 ; *Dent* v. *Ferguson*, 132 U. S. 50.

In putting our decision on the ground on which we have put it we do not mean to intimate that the finding of the master that the insolvent was not *in pari delicto* would have stood had the master been directed to review the findings on that point made by the decree of the Court of Insolvency on June 15, 1900, and by the master in his report of October 20, 1906, confirmed by the decree of the single justice made on November 24, 1906. We think it proper to add that we have read all the evidence upon which the master reports he based his finding. That evidence consists of the evidence put in at the hearing on the supervisory bill which was dismissed in March, 1895, the evidence put in in the Court of Insolvency in 1895 and 1898, the evidence put in before the master under the supervisory bill of July 2, 1900, whose report is dated October 20, 1906, and the exhibits put in at those hearings. The master expressly states that "no witnesses appeared before me." There is reason to think that part of the evidence on which the master (who reported on October 20, 1906) made his findings has not been sent to us. But on the evidence on which the master whose report is now before us says he found as a fact that the insolvent was not *in pari delicto*, that finding of the master could not have stood had that issue been one to be decided by him. Whether the insolvent was or was not *in pari delicto* depended upon the credit given or not given to his testimony. The story told by him was one which explained away his assent to written agreements made at the time and explained away his conduct at the time and was directly contradicted by the testimony of disinterested witnesses. The deposition of one of the persons from Wooster which he himself put in evidence showed that in the story he told to them there were several false representations. The judge of the Court of Insolvency who saw all the witnesses did not believe his story. The master whose report is dated October 20, 1906, did not believe his story. How far the findings of this master were founded on testimony of witnesses who appeared before him is

not on the record altogether plain. The master whose report is now before us (had he been directed to review these findings) should not have upset the findings made by the Court of Insolvency and by the former master unless they were plainly wrong. *Newton* v. *Baker*, 125 Mass. 30. *Whitney* v. *Leominster Savings Bank*, 141 Mass. 85. *Staples* v. *Mullen*, 196 Mass. 132. This court having before it the same documentary evidence which was before the master, stands where he stood, and that rule does not apply to his findings. *Harvey-Watts Co.* v. *Worcester Umbrella Co.* 193 Mass. 138. Not only in our opinion is it the fact that the evidence does not show that the judge of the Court of Insolvency and the master who reported on October 20, 1906, were plainly wrong, but that evidence in our opinion shows that they were right.

The only question raised by the supervisory bill here in question is whether the insolvent is entitled to relief.

The entry must be

*Bill dismissed.*